UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

----------------

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 1:08-CR-47 |
| Plaintiff, | |
| v. | Hon. Paul L. Maloney<br>Chief United States District Judge |
| MARIE JEANETTE MASON, | |
| Defendant. | |

## PLEA AGREEMENT

This constitutes the plea agreement between MARIE JEANETTE MASON and the U.S. Attorney's Offices for the Western District of Michigan, the Eastern District of Michigan, and the Southern District of Indiana. The terms of the agreement are as follows:

1. **Defendant Agrees to Plead Guilty.** The Defendant agrees to plead guilty to Counts 1, 2, and 4 of the Indictment, charging her with conspiring to commit arson in violation of Title 18, United States Code, Section 844(n); with committing aggravated arson in violation of Title 18, United States Code, Section 844(f)(1) and (2); and with committing arson in violation of Title 18, United States Code, Section 844(i).

2. **Defendant Understands the Crimes.** In order for Defendant to be guilty of violating Title 18, United States Code, Section 844(n), the following must be true: (1) the Defendant must have knowingly and willfully agreed with one or more persons to

maliciously damage or destroy, or to attempt to damage or destroy, by means of fire, a building or other personal property; (2) the building or personal property must have been owned by an institution receiving Federal financial assistance, or have been used in interstate or foreign commerce or in an activity affecting such commerce; (3) thereafter, and in furtherance of the agreement, one or more persons who were party to the agreement must have committed an overt act, that is, an act that constituted a substantial step towards the commission of one or more of the crimes contemplated in the agreement. In order for Defendant to be guilty of violating Title 18, United States Code, Section 844(f)(1) and (2), the following must be true: (1) the Defendant must have damaged and destroyed, or attempted to damage and destroy, real or personal property; (2) the Defendant must have used fire or explosives as the means for such destruction or attempted destruction; (3) the building or personal property must have been owned by an institution receiving Federal financial assistance; and (4) by her conduct, the Defendant must have created a substantial risk of injury to any person, including public safety officers performing their duties. In order for Defendant to be guilty of violating Title 18, United States Code, Section 844(i), the following must be true: (1) the Defendant must have damaged and destroyed or attempted to damage and destroy real or personal property, or have aided and abetted another person in causing or attempting to cause such damage; (2) the Defendant must have used fire or explosives as the means for such destruction, or have aided and abetted another in doing so; (3) the building or personal property in question must have been used in

interstate or foreign commerce or in an activity affecting such commerce. The Defendant is pleading guilty because she is guilty of the charges described above.

3. <u>The Defendant Understands the Penalties</u>. The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 844(n) is the following: imprisonment for not less than five years nor more than twenty years; supervised release for any term of years or life; a fine of $250,000; and a mandatory special assessment of $100. The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 844(f)(1) and (2) is the following: imprisonment for not less than seven years nor more than forty years; supervised release for any term of years or life; a fine of $250,000; and a mandatory special assessment of $100. The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 844(i) is the following: imprisonment for not less than five years nor more than twenty years; supervised release for any term of years or life; a fine of $250,000; and a mandatory special assessment of $100. The Defendant agrees to pay the special assessments at or before the time of sentencing unless the Defendant affirmatively demonstrates to the Court that she lacks the ability to pay.

4. <u>Restitution</u>. The Defendant understands that she will be ordered to pay full restitution to the victims of the offenses that are detailed in paragraph 5 of this agreement. The Defendant expressly agrees that the offenses charged in Counts 1, 2 and 4 were part of a pattern of criminal activity that caused significant financial loss in addition to the losses caused by the charged offenses. Accordingly, and pursuant to Title 18, United States Code, Sections 3663(a)(1)(A) and (3), the Defendant agrees that

3

her restitution obligation should include losses suffered by parties other than the victims of the offenses charged in Counts 1, 2 and 4. The parties currently believe that the applicable amount of restitution is $4,189,536.00, but recognize and agree that this amount could change based on facts that come to the attention of the parties prior to sentencing.

5.   Factual Basis of Guilt and Stipulation of Relevant Facts.   The Defendant and the United States agree and stipulate to the following statement of facts which need not be proven at the time of the plea or sentencing:

A.   On an unknown date before, and near in time to, December 31, 1999, Defendant obtained and reviewed printed information that had been gathered by an acquaintance of hers regarding plant genetic research that was being funded by the United States Government and that was being conducted at Michigan State University (MSU) in East Lansing, Michigan, by employees of that institution.

B.   On or about December 30, 1999, in Empire, Michigan, Defendant was joined by a group that included Frank Ambrose. Defendant, Ambrose, and one or more other members of the group discussed committing an arson in order to destroy records of plant genetic research and the facility where such research was being conducted.

C.   In the early evening hours of December 31, 1999, Defendant and Ambrose traveled by car from Empire to the campus of MSU in East Lansing, Michigan, for the purpose of carrying out the arson they had discussed in

4

Empire. They located Agriculture Hall, entered the building, and located the third floor office spaces they had previously identified as the place where records of, and papers related to, plant genetic research were maintained. Ambrose then left the building to purchase gasoline and other materials to use in the arson, while Defendant remained in the largely uninhabited building.

D. When Ambrose returned to Agriculture Hall, Defendant let him into the locked building. The two returned to the third floor office spaces where they opened file cabinets, poured gasoline on the files and various computer hard-drives, and on the floor. Ambrose fashioned a crude fuse using rolled up paper and lit it, unintentionally causing gasoline fumes that had accumulated in the enclosed space to ignite.

E. The resulting explosion burned the portion of Defendant's hair that protruded beneath the dark stocking cap that she was wearing, and prevented her from finishing the message "No GMO" that she had begun to spray-paint on an interior wall. The explosion also blew a large, heavy, multi-paneled window and its frame out of the window aperture and into the parking lot below, where it landed on the sidewalk and broke apart on impact. The two then left the building and returned to Empire, where they met others of the group. They told the group that the arson had been a success but that there had been an explosion and that Mason's hair had been burned. After the group confirmed that neither Ambrose nor Defendant had been injured, one of them agreed to cut Defendant's hair short to remove the burned portion.

5

F. Defendant and Ambrose were motivated to commit the arson by their belief that genetic plant research was harmful to the natural environment and that, by burning a facility and records involved in such research, they could intimidate, coerce, and deter government agencies, private organizations, and the general public from conducting or supporting such research. Accordingly, the intended "No GMO" message was shorthand for "No Genetically Modified Organisms."

G. The fire at Agriculture Hall caused property damage in excess of $1.1 million dollars. It also required responses by the fire departments of three adjacent jurisdictions, and numerous personnel of those departments were at substantial risk of physical injury while they performed their duties. Further, any pedestrian passerby beneath the window at the time of the explosion would have been at substantial risk of physical injury from the falling window and frame.

H. The research in question was being conducted by MSU using funding provided by the United States Government, specifically, the U.S. Agency for International Development (US AID). At the time, US AID had funded the research for ten years at approximately $2 million dollars per year. The MSU research also involved interstate and international commerce because those conducting it included persons from States outside Michigan and countries outside the United States; because the result of the research was intended to assist populations in countries outside the United States; and because MSU is an academic institution that draws significant numbers of students and employees from outside Michigan and outside the United States.

I. The next day, on January 1, 2000, Defendant, Ambrose, and the others observed commercial logging equipment that included a "John Deere" brand Hydro-Ax Shear and a commercial flatbed trailer parked off to the side of a road in or near Mesick, Michigan. The five decided to destroy the equipment by fire and drove to a nearby gas station and convenience store to purchase materials with which to burn the equipment. While Ambrose pumped gasoline into a container, Mason and the others entered the store and purchased charcoal, firewood, and a disposable lighter.

J. The group then returned to the logging equipment and, using the flammable materials just purchased, set fire to it. Using a can of black spray-paint, one of the group painted the letters "ELF" and the words "Log in Hell" and "Go Log in Hell" on the flatbed trailer. The resulting fire caused property damage of approximately $18,000 dollars

K. Defendant, Ambrose, and the others were motivated to commit the arson by their belief that commercial logging is harmful to the natural environment and that, by burning property used in that industry, they could intimidate, coerce, and deter government agencies, private organizations, and the general public from conducting or supporting it.

L. The logging equipment was used in interstate commerce, and in an activity affecting interstate commerce, because it was designed and used for harvesting trees for the purpose of reducing them to commercial lumber, and because such lumber is then used in interstate commerce. In particular, at the time it was destroyed, the equipment in question was under contract to a logging

company that was harvesting timber for processing at the Pine Tech Lumber Mill in Lake City, Michigan. Pine Tech products were, and are, sold and marketed by the Pine Forest Lumber Company in Plymouth, Michigan, a company that sells and ships lumber to wholesale lumber distributors, office wholesalers, landscaping suppliers, furniture manufacturers, and other businesses in interstate commerce. Specifically, Pine Tech lumber is distributed by Pine Forest Lumber to businesses in other Midwestern States, in Mid-Atlantic States, and in Canada.

M. The "ELF," or "Earth Liberation Front," was, and remains, a loosely organized movement of individuals who are committed to the cessation of commercial, research, and other activities that its adherents consider harmful to the natural environment. ELF espouses a philosophy of what its adherents refer to as "direct action" and "monkey-wrenching," terms that denote acts of politically-motivated violence designed to intimidate or coerce segments of society, including the general civilian population, private business, and government, into changing their attitudes about environmental issues and/or ceasing activities considered by the movement to have a negative impact on the natural environment. ELF direct actions include acts that violate the criminal laws of the United States or of individual States and that are dangerous to human life. Arson is one of the most frequently employed forms of ELF direct action and monkey-wrenching.

N. The MSU arson was subsequently claimed by, and advertised as, an ELF direct action on the movement's Internet website.

8

O. Defendant admits that, in addition to the MSU and Mesick arsons, she participated in the following acts of property destruction on behalf of ELF:

(i) Aug. 7, 1999 - Escanaba, MI - (arson) two power boats; loss $9,436.

(ii) Aug. 22, 1999 - Bloomington, IN - (arson) Deer Park construction site; loss $95,000.

(iii) Nov. 2, 1999 - Bloomington, IN - (vandalism) logging equipment; loss $55,000.

(iv) Jan. 23, 2000 - Bloomington, IN - (arson) Sterling Woods Development; loss $200,000.

(v) Apr. 30, 2000 - Bloomington, IN - (vandalism) Crider & Crider Equipment; loss $550,000.

(vi) Jun. 26, 2000 - Bloomington, IN - (tree-spiking) Morgan-Monroe State Park; loss $5,500.

(vii) Jun. 26, 2000 - Bloomington, IN - (tree-spiking) Yellowwood State Forest; loss $1,600.

(viii) Jul. 2, 2000 - North Vernon, IN - (arson-vandalism) Rose Acre Farm; loss $100,000.

(ix) Oct. 18, 2000 - Shoals, IN - (vandalism) Martin State Park; loss $55,000.

(x) Mar. 21, 2003 - Superior Township, MI - (arson) Mystic Forest; loss $1,000,000.

(xi) Jun. 4, 2003 - Macomb County, MI - (arson) Willow Ridge; loss $1,000,000.

9

(xii)   Sept. 21, 2003 - Stanwood, MI - (attempted arson) Ice Mountain Water Co. Pumping Station; loss de minimus.

P.   Based on the foregoing, and consistent with Paragraph 4, Defendant stipulates and admits that the property destruction attributable to her pattern of criminal activity on behalf of ELF exceeded $2,500,000 but was less than $7,000,0000, and that the offenses charged in Counts 1, 2 and 4 involved, or were intended to promote, a "Federal crime of terrorism" as that term is defined in 18 U.S.C. § 2332b(g)(5).

6.   <u>The Sentencing Guidelines</u>.   The Defendant understands that, although the United States Sentencing Guidelines (the "Guidelines") are not mandatory, the Court must consult the Guidelines and take them into account when sentencing the Defendant. The Defendant understands that the Court, with the aid of the presentence report, will determine the facts and calculations relevant to sentencing. The Defendant understands that the Defendant and the Defendant's attorney will have the opportunity to review the presentence report and to make objections, suggestions, and recommendations concerning the calculation of the Guideline range and the sentence to be imposed. The Defendant further understands that the Court shall make the final determination of the Guideline range that applies in this case, and may impose a sentence within, above, or below the Guideline range, subject to the statutory maximum and minimum penalties described elsewhere in this Agreement. The Defendant further understands that disagreement with the Guideline range or sentence shall not constitute a basis for withdrawal of the plea.

7. <u>Waiver of Constitutional Rights.</u>  By pleading guilty, the Defendant gives up the right to persist in a plea of not guilty and the right to a speedy and public trial by jury or by the Court. As a result of the Defendant's guilty plea, there will be no trial. At any trial, whether by jury or by the Court, the Defendant would have had the following rights:

a. The right to the assistance of counsel, including, if the Defendant could not afford an attorney, the right to have the Court appoint an attorney to represent the Defendant.

b. The right to be presumed innocent and to have the burden of proof placed on the Government to prove the Defendant guilty beyond a reasonable doubt.

c. The right to confront and cross-examine witnesses against the Defendant.

d. The right, if the Defendant wished, to testify on her own behalf and present evidence in opposition to the charges, including the right to call witnesses and to subpoena those witnesses to testify.

e. The right not to be compelled to testify and, if the Defendant chose not to testify or to present evidence, the right to be protected from having that choice used against her at trial.

By pleading guilty the Defendant also gives up any and all rights to pursue any affirmative defenses, including, but not limited to: alibi, statute-of-limitations, duress, entrapment, coercion, and insanity. The Defendant also gives up the right to raise any Fourth Amendment or Fifth Amendment issues, along with any other issues that could have been raised by pretrial motion.

8. <u>The United States Attorney's Office Agrees</u>: The U.S. Attorney's Office agrees not to oppose the Defendant's request for a two-level reduction of her offense level for acceptance of responsibility under §3E1.1(a) of the Sentencing Guidelines. However, the U.S. Attorney's Office reserves the right to object to Defendant's request if it subsequently learns of conduct by the Defendant that is inconsistent with the criteria set forth in the Commentary to Section 3E1.1. Should the Court grant a two-level reduction as provided herein, the Government states that the Defendant has assisted authorities in the investigation or prosecution of her own misconduct by timely notifying it of her intention to enter guilty pleas, thereby permitting the Government to avoid preparing for trial, and hereby moves the Court to grant an additional one-level reduction if the adjusted offense level is 16 or greater.

9. <u>Recommendations Regarding Sentence</u>: The U.S. Attorney's Office agrees not to advocate for a sentence to imprisonment of greater than 240 months, even if the final adjusted advisory Sentencing Guideline range proposes a higher sentence. Further, in the event that the Court applies the terrorism enhancement of § 3A1.4 of the Sentencing Guidelines, the U.S. Attorney's Office agrees not to oppose a motion by the Defendant for a downward departure on the grounds of mitigating circumstances, pursuant to §5K2.0(a)(1)(A), to the extent that the requested departure would produce a final adjusted advisory Guideline range that encompasses 240

months, and provided that such a motion is supported by the facts. The U.S. Attorney's Office reserves the right to oppose any such motion by the Defendant to the extent that it petitions the Court to depart below that range. Notwithstanding this promise, the Defendant understands that the position of the U.S. Attorney's Office is that the §3A1.4 enhancement should be applied as a matter of law, and also understands that the United States will advocate that legal position at sentencing. Finally, the U.S. Attorney's Office agrees that it will not seek to appeal any sentence to imprisonment of at least 180 months.

10. <u>Non-prosecution Agreement</u>. The U.S. Attorney's Office for the Western District of Michigan agrees, upon sentencing, to move to dismiss Count 3 of the Indictment as it relates to Defendant. The U.S. Attorney's Offices for the Western District of Michigan, the Eastern District of Michigan, and the Southern District of Indiana agree to not bring additional criminal charges against the Defendant for her conduct related to the ELF or other extremist environmental or animal-rights groups, organizations, or movements, provided that the conduct is disclosed to the Government by the Defendant or her attorney prior to the date that this agreement is executed. The Defendant shall remain subject to prosecution for any criminal activity that she has not disclosed to the Government prior to that date or that she might commit after that date. This non-prosecution agreement does not apply to any crime of violence that resulted in personal injury to another person, nor does it apply to any criminal tax violations or conspiracy to commit such violations chargeable under 18 U.S.C. § 371.

11. <u>Consequences of Breach</u>. If the Defendant breaches any provision of this agreement, whether before or after sentencing, the United States shall have the

right to terminate this agreement and to deny the Defendant any or all benefits to which she would otherwise be entitled under the terms of this agreement. In the event that the United States elects to terminate this agreement on such grounds, then the agreement shall be considered null and void, the parties shall return to the same position they were in prior to the execution of this agreement, and the prosecution shall proceed as if the agreement had never existed. In such an event, the Defendant shall remain liable for prosecution on all original charges, and the United States shall also be free to bring such additional charges as the law and facts warrant, both in the Western District of Michigan and elsewhere. The Defendant further agrees to waive and forever give up her right to raise any claim that any such prosecution is time-barred, provided that such prosecution is brought within one (1) year of the breach that gives rise to the termination of this agreement.

12. <u>The Court Is Not a Party to This Agreement.</u> The Defendant understands that the Court is not a party to this agreement and is under no obligation to accept any recommendation by the U.S. Attorney's Office or the parties regarding the sentence to be imposed. The Defendant further understands that, even if the Court ignores such a recommendation or imposes any sentence up to the maximum established by statute, the Defendant cannot, for that reason, withdraw her guilty plea, and she will remain bound to fulfill all of her obligations under this agreement. The Defendant understands that no one – not the prosecutor, the Defendant's attorney, or the Court – can make a binding prediction or promise regarding the sentence that the Defendant will receive, except that it will be within the statutory maximum.

14. **This Agreement Is Limited to the Parties.** This agreement is limited to the U.S. Attorney's Offices for the Western District of Michigan, the Eastern District of Michigan, and the Southern District of Indiana, and cannot bind any other Federal, State or local prosecuting, administrative or regulatory authority. This agreement applies only to crimes committed by the Defendant.

15. **This Is the Complete Agreement.** This agreement has been entered into by both sides freely, knowingly, and voluntarily, and it incorporates the complete understanding between the parties. No other promises have been made, nor may any additional agreements, understandings or conditions be entered into unless in a writing signed by all parties or on the record in open court.

CHARLES R. GROSS
United States Attorney
Western District of Michigan

12 Aug 2008
Date

HAGEN WALTER FRANK
Assistant United States Attorney
Western District of Michigan

STEPHEN J. MURPHY, III (date)
United States Attorney
Eastern District of Michigan

TIMOTHY M. MORRISON (date)
Acting United States Attorney
Southern District of Indiana

I have read this agreement and carefully discussed every part of it with my attorneys. I understand the terms of this agreement, and I voluntarily agree to those

15

14. **This Agreement Is Limited to the Parties.** This agreement is limited to the U.S. Attorney's Offices for the Western District of Michigan, the Eastern District of Michigan, and the Southern District of Indiana, and cannot bind any other Federal, State or local prosecuting, administrative or regulatory authority. This agreement applies only to crimes committed by the Defendant.

15. **This Is the Complete Agreement.** This agreement has been entered into by both sides freely, knowingly, and voluntarily, and it incorporates the complete understanding between the parties. No other promises have been made, nor may any additional agreements, understandings or conditions be entered into unless in a writing signed by all parties or on the record in open court.

CHARLES R. GROSS
United States Attorney
Western District of Michigan


_____  _____
Date                         HAGEN WALTER FRANK
                             Assistant United States Attorney
                             Western District of Michigan


_____  _____
STEPHEN J. MURPHY, III (date)  TIMOTHY M. MORRISON (date)
United States Attorney         Acting United States Attorney
Eastern District of Michigan   Southern District of Indiana


I have read this agreement and carefully discussed every part of it with my attorneys. I understand the terms of this agreement, and I voluntarily agree to those

15

14. <u>This Agreement Is Limited to the Parties</u>. This agreement is limited to the U.S. Attorney's Offices for the Western District of Michigan, the Eastern District of Michigan, and the Southern District of Indiana, and cannot bind any other Federal, State or local prosecuting, administrative or regulatory authority. This agreement applies only to crimes committed by the Defendant.

15. <u>This Is the Complete Agreement</u>. This agreement has been entered into by both sides freely, knowingly, and voluntarily, and it incorporates the complete understanding between the parties. No other promises have been made, nor may any additional agreements, understandings or conditions be entered into unless in a writing signed by all parties or on the record in open court.

CHARLES R. GROSS
United States Attorney
Western District of Michigan

_____
Date

_____
HAGEN WALTER FRANK
Assistant United States Attorney
Western District of Michigan

_____
STEPHEN J. MURPHY, III (date)
United States Attorney
Eastern District of Michigan

_____ 8/11/08
TIMOTHY M. MORRISON (date)
~~Acting~~ United States Attorney
Southern District of Indiana

I have read this agreement and carefully discussed every part of it with my attorneys. I understand the terms of this agreement, and I voluntarily agree to those

15

terms. My attorneys have advised me of my rights, of possible defenses, of the sentencing provisions, and of the consequences of entering into this agreement. No promises or inducements have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. Finally, I am satisfied with the representation of my attorneys in this matter.

9/8/08
Date

*Marie J. Mason*
MARIE JEANETTE MASON
Defendant

I am MARIE JEANETTE MASON's attorney. I have carefully discussed every part of this agreement with my client. Further, I have fully advised my client of her rights, of possible defenses, of the sentencing provisions, and of the consequences of entering into this agreement. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

9/8/08
Date

*John Minock*
JOHN R. MINOCK, Esq.
Attorney for Defendant