UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
- - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

                    Plaintiff,                            No. 1:08-CR-47

           vs.                                Hon. Paul L. Maloney
                                                Chief United States District Judge

MARIE JEANETTE MASON,
AREN BERNARD BURTHWICK and
STEPHANIE LYNN FULTZ,

                    Defendants.

_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

Comes now the United States of America by United States Attorney Donald A. Davis and Assistant United States Attorney Hagen W. Frank and submits its Sentencing Memorandum pursuant to LCrR 32.2(h).[1]  The Government addresses the sentencing of all three Defendants collectively, and respectfully requests that the Court consider this filing at each Defendant's sentencing.

Sentencing Standards

Notwithstanding the decision in United States v. Booker, 543 U.S. 220 (2005), sentencing courts are still required to correctly compute the advisory Sentencing Guideline range and are still obliged to consider them when imposing sentence.  United States v. Gale, 468 F.3d 929, 934 (6th Cir. 2006).  Accordingly, a sentencing court's Guidelines calculations are still reviewed

---

[1]This filing was due five working days before the February 5 sentencing date, or on January 29.  The undersigned respectfully requests that the Court accept this filing one day out of time.

according to pre-Booker standards.  United States v. Davidson, 409 F.3d 304 (6th Cir. 2005).  It is now firmly established, however, that sentencing courts have the discretion to impose a sentence outside the advisory Guideline range based upon their articulated balancing of the statutory sentencing factors of 18 U.S.C. § 3553(a), the facts of the case, and the arguments of the parties.  United States v. Lalonde, 509 F.3d 750, 769 (6th Cir. 2007) (citing United States v. Gall, 128 S. Ct. 586 (2007)).  Taking all these matters into consideration, a sentencing court's duty is to impose an individualized sentence that is "sufficient, but not greater than necessary" to satisfy the statutory purposes of sentencing set out in 18 U.S.C. § 3553(a).  Id. at 770.

On review, sentences are reviewed for procedural and substantive reasonableness. Whether a sentence is procedurally reasonable depends upon: (1) whether a district court correctly calculated the applicable Guidelines range and used it as a start point of its sentence analysis; (2) whether the parties were given the opportunity to argue for sentences they deemed appropriate and whether a district court made an individualized sentencing decision based upon the facts and the § 3553(a) factors; and (3) whether a district court explained its reasoning with enough detail to both allow for meaningful appellate review and to give the impression of fair sentencing.  United States v. Bolds, 511 F.3d 568, 579-80  (6th Cir. 2007).

With respect to substantive reasonableness, all sentences are reviewed for abuse of discretion, but sentences from within the Guideline range are presumed reasonable.  United States v. Vonner, 516 F.3d 382 (6th Cir. 2008) (reconfirming the holding of United States v. Williams, 436 F.3d 706 (6th Cir. 2006) in light of the holding in Rita v. United States, 558 U.S. 338 (2207)).  The substantive reasonableness of a sentence that varies outside the Guideline range is reviewed only for abuse of discretion, without benefit or burden of a presumption in its

favor or to its detriment.  Bolds, 511 F.3d at 579-80 (citing Gall, 128 S. Ct. at 597).  Indeed, district courts are given "wide latitude in imposing sentences outside the Guidelines . . . so long as the explanation sufficiently articulates the sentence's appropriateness in relation to the 18 U.S.C. § 3553(a) sentencing factors."  United States v. Johnson, __ F.3d __, No. 07-2447, slip op. at 8-9 (6th Cir. Jan. 26, 2009).  Although the standards for determining whether a sentence is substantively unreasonable continue to develop, a sentencing court may abuse its discretion where it "'select[s] the sentence arbitrarily, bas[es] the sentence on impermissible factors, fail[s] to consider pertinent § 3553 (a) factors or gives an unreasonable amount of weight to a pertinent factor.'"  Lalonde, 509 F.3d at 770 (quoting United States v. Jones, 489 F.3d 243, 252 (6th Cir. 2007) (alterations in original)).

While it is not error for a district court to acknowledge the appellate standards under which a sentence will be reviewed, United States v. Cage, 458 F.3d 537, 541 (6th Cir. 2006), a district court's sentencing lodestar is the need for a sentence that is sufficient without being excessive.  United States v. Foreman, 436 F.3d 638, 6344 n.1 (6th Cir. 2006).

The Government's Broader Perspective

Simply stated, the Government's overarching perspective on the three remaining defendants in this case is that Stephanie Fultz and Aren Burthwick were very minor players in the New Year's Eve MSU arson and the logging equipment arson that followed the next day. Defendant Marie Mason, on the other hand, was not only a principal architect of the MSU arson, she was, and remains, an unrepentant and unapologetic advocate of violence and intimidation as a means of protest.  The arson at MSU was not the first time Defendant Mason destroyed property for her cause, and it was far from the last time.  Notwithstanding her demure public

3

manner and unthreatening physical appearance, Defendant Mason is a prototypical "true-believer" eco-extremist; Defendants Fultz and Burthwick, on the other hand, are essentially two people who found themselves in the wrong place at the wrong time with the wrong people and, to their great misfortune many years later, failed to run in the opposite direction as fast as they could.

The MSU Arson

Even if viewed solely from an economic-loss perspective, the arson of Agriculture Hall was an extremely serious violent crime.  Not only did MSU suffer the significant tangible and quantifiable property loss of some $1 million dollars, it had to bear costs caused by disrupting the work of some 30 MSU employees who had to temporarily relocate from Agriculture Hall, a cost described in the letter from MSU Associate General Counsel Michael Kiley as "inestimable." Mason Presentence Report (PSR) at 17, para. 58.

There was, however, also a non-economic cost to the fire that perhaps eclipsed the dollar loss.  As summarized in Mr. Kiley's letter, MSU is a leading research university that had already been targeted by eco-extremists in July 1993.[2]  The Agriculture Hall arson was therefore the second attack against MSU by eco-fanatics, and it engendered a sense of unease in the research

---

[2]The perpetrator of that attack was Rodney Coronado, an extremist who was convicted not only for that offense in this District in 1995 in Case No. 1:93-CR-116, but also in the Southern District of California in 2007 in Case No. 3:06-CR-298 for violating 18 U.S.C. § 842(p)(2)(A) [teaching construction of destructive devices].  As the Government will establish at sentencing, Coronado is a known associate of Defendant Mason's; indeed, she repeatedly exchanged telephone calls with Coronado during the period between a $50 million ELF arson in August 2003 in San Diego that coincided with Coronado's "lecture," a pair of million-dollar ELF arsons in San Diego on September 19, 2003, and the break-in and attempted fire-bombing of the Ice Mountain Water Co. facility in Stanwood, Michigan on September 20, 2003, that she was involved in.  Mason PSR at 10, para. O(xii).

community that persists to the present.  "[T]he resulting harm is inflicted on the entire academic community.  The affront is profound in nature, and the impact is truly severe, both for the institution and for the whole academic enterprise."  Mason PSR at 18, para. 58.

Beyond the economic and psychic harms it caused, and as the Government intends to demonstrate at sentencing, the fire was also an especially dangerous one because of the risk of injury or death to passers-by and emergency responders that it created.  With regard to passers-by, the explosion blew a large, multi-paneled window out of its third-floor aperture.  The window landed intact, with its frame, on a bike rack and the sidewalk below, where it shattered.  As photos make clear, had any student or other person been present at the point of impact, he or she would almost certainly have been severely injured, if not  killed.  With regard to emergency responders, and as the video of the fire will demonstrate, while trying to locate the epicenter of the fire, fire-fighters at one point found themselves maneuvering through thick smoke in the space between the third-floor source of the fire and a portion of the roof that had also caught fire. With fire beneath them and fire above them, those fire-fighters were clearly in extreme danger.

Defendant may fairly assert that she never intended for the fire to become quite as serious as it did.[3]  That may be so, but the fact remains that any thinking person would have to have known that a fire in an historic building located in the middle of a major university's campus

---

[3] Although Defendant is fully accountable for even the unforseen consequences of something as inherently dangerous as arson, the Government does not maintain that Defendant meant for the MSU fire to be as dangerous as it became.  First, it seems unlikely that either Defendant or her co-defendant Frank Ambrose intended to cause an explosion in the room they were in while they were in it, and Defendant certainly cannot have intended to set her own hair on fire.  Defendant and Ambrose may have been committed to their cause, but they were not suicidal.  Second, it would have made little sense for Defendant to spray paint the ELF slogan "No GMO" on an interior wall if she and Ambrose had meant to burn the building down.

5

would be the kind of fire that would compel firefighters to enter the building.  Unlike perhaps setting fire to a residence under construction in some as-yet-uninhabited development, where it might be reasonable to think that firefighters could remain outside and work to simply prevent the fire from spreading, setting fire to Agriculture Hall carried with it a reasonable certainty that firefighters would have to go into a burning building.  That knowledge did not deter Defendant Mason from setting the fire in the first place, nor did the scope of the resulting fire impress upon her the seriousness of her misdeed or otherwise deter her from setting more fires afterwards.  See Mason PSR at 9-10, para. O.

        To the contrary, on December 31, 1999, an Earth Liberation Front "communique" about the fire was published on the Internet.  It crowed:

> The ELF takes credit for a strike on the offices of Catherine Ives, rm. 324 Agriculture Hall at Michigan State University on Dec. 31, 1999.  This was done in response to the work being done to force developing nations . . . to switch from natural crop plants to genetically engineered [crops].  Monsanto and USAID are major funders [sic] of the research and promotional work being done through Michigan State University.  According to local newspapers the fire caused some $400,000 in damage.  Cremate Monsanto, Long live the ELF!  On to the next GE [genetic engineering] target!

Government Exhibit (Gov't Ex.) 3.

        Almost nine years later, an article published in the "EarthFirst! Journal"[4] provided the following long-term assessment by the eco-extremist community of the MSU arson:

---

        [4]The ELF grew out of the "Earth First!" (EF!) organization.  EF! is a radical group formed in 1980 that has a history of engaging in lawful protest, civil disobedience, and more serious criminal acts such as "tree spiking."  In the early 1990's, the more radical elements of EF! broke off to form the ELF and began to commit, and to encourage its adherents to commit, more serious criminal activity in support of the shared EF!/ELF agenda.  Although not all EF! members are involved with ELF, EF! is the gateway into ELF for many ELF adherents, that is, direct action participants are typically recruited from the memberships of EF! chapters.  Put another way, ELF members by night are typically EF! members by day.

Although not nearly as ambitious or costly as the ELF's destruction of the Vail ski resort in October 1998, the burning of MSU's Agriculture Hall was nevertheless an iconic, original and effective action.  . . .  Occurring just one month after the World Trade Organization protests in Seattle, MSU could be considered the first ELF action of the anti-globalization era.  . . .  The MSU action was a herald of this trend, and it helped to transform the ELF into a national force.[5]

Earth First Journal, The Green Scare, Round Two – The ELF Takes on Genetic Engineering, available at http://www.earthfirstjournal.org/article.php?id=363.

### Defendant Mason's Acts in the Larger Context

As the stipulated facts in the PSR demonstrate, the "iconic, original and effective action" of sneaking into Agriculture Hall at night and setting it on fire was far from Defendant's last ELF action.  Over the next several years, Defendant participated in many other acts of arson and vandalism.  The last of these stipulated acts was the September 2003 trespass and attempted fire-bombing of the Ice Mountain Water facility in Mecosta County, Michigan; like a bookend, a communique similar to the MSU announcement was issued:

When all legal avenues of dissent have ben undertaken to no avail, only one option remains.  Illegal Direct Action. . . .  We will no longer stand idly by while corporations profit at the expense of all others.  To this end, we have taken action against one of the pumping stations that Perrier uses to steal water.  On the night of Sunday, the 21st of September . . . [a]ccess to one of the pumping stations was gained and timed incendiary devices were placed.  We will no longer allow the commodification of life to continue.  Action must, and will, be taken, for it is our only chance.  Water for life, not for profit!  Welcome to Michigan.  ELF.

Earth Liberation Front Claims Incendiaries Left At Michigan Water Bottling Plant: "Water for Life, Not For Profit!"  (Gov't Ex. 5).

---

[5]The reference to the World Trade Organization "protests" – days of rioting in Seattle in late November 1999 that resulted in the declaration of a "civil emergency," imposition of a curfew, and deployment of National Guard troops, see Curfew in effect as Seattle struggles to control WTO protests, CNN, Nov. 30, 1999, at http://www.cnn. com/US/9911 /30/wto. 04/index.html – is, at minimum, ironic, given that Defendant Mason has a tattoo on her right shoulder that depicts a fairy lighting the fuse of a smiling bomb that bears the letters "WTO."

All of these stipulated acts were committed for the express purpose of instilling fear in people and organizations who were engaged in lawful activities, of bullying and intimidating them on behalf of the "Earth Liberation Front" from doing things that Defendant and her ilk did not like, and of trying to influence the orderly conduct of government through coercion.  Finally, everything Defendant did contributed directly to the significant law-enforcement problem posed by violent animal-rights and eco-defense fanaticism, a problem that was described in 2002 by the FBI's Domestic Terrorism Section Chief in testimony before Congress thus:

> During the past decade, we have witnessed dramatic changes in the nature of the [domestic] terrorist threat.  In the 1990's, right-wing extremism overtook left-wing terrorism as the most dangerous domestic terrorist threat to the country.  During the past several years, special interest extremism, as characterized by the Animal Liberation Front (ALF) and the Earth Liberation Front (ELF), has emerged as a serious terrorist threat.

The Threat of Eco-Terrorism (Feb. 12, 2002) (testimony of James F. Jarboe), available at http://www.fbi.gov/congress/congress02/jarboe021202.htm

When this testimony was given, the FBI estimated that ELF and ALF had been responsible for approximately 600 criminal acts in the United States since 1996, causing damages of over $43 million.  Id.  As stipulated to by Defendant, her own misconduct added well over $3 million to that total.  (PSR at 7, para. 10).  Moreover, at the same time that the FBI was educating Congress about the problem in 2002, Defendant was a full-fledged and active member/adherent of the ELF organization and movement.  Defendant's crimes were therefore not only extremely serious in their own right, they were also directly connected to the criminal trend that eclipsed right-wing extremism as the FBI's primary domestic terrorism concern during the decade that straddled the turn of the millennium.

<u>Defendant's Commitment to Cause and Standing in the Eco-extremist Community</u>

As the Government will demonstrate at sentencing, Defendant Mason remained a committed eco-extremist in the interim between the Ice Mountain action in September 2003 and her arrest on the instant charges in March 2008.  After moving to Cincinnati in 2004, she undertook efforts to establish an EF! chapter for the purpose of opposing plans to build a Wal-Mart store and a residential development near her new neighborhood.  During this period, she also made contact with "Roadblock EF!", an Earth First! group in Bloomington, Indiana, that opposes the current phase of the I-69 extension project.[6]  She joined members of that group at an EF! organizers' meeting that was held in Florida during February 2008, and then joined them again at an early March 2008 EF! meeting in Evansville, Indiana.  Afterwards, she described the Indiana group as being small but very organized and stated that the group was "good to go" for when I-69 construction began.  Prior to this meeting, Defendant engaged in an e-mail dialogue with Roadblock concerning her providing "training" to the group.

Significantly, and predictably, opponents of the I-69 project have not limited their opposition to lawful means, but, beginning in about January 2008, have engaged in acts of trespass, vandalism, harassment, and communicating threats against businesses, government offices, and individuals involved with the construction project.

Defendant was arrested on March 10, 2008 and, judging from the response of the eco-extremist and anarchist communities on the Internet, that arrest was the beginning of her elevation to the status of movement-heroine.  Although it might generally be unfair to infer a

_____

[6]The April 2000 property destruction in Bloomington that Defendant participated in, and that caused an estimated $550,000 in loss, was carried out in opposition to an earlier phase of the I-69 extension project.  PSR at 9, para. O(v).

negative based on the nature of a person's supporters, doing so in this instance is appropriate because Ms. Mason has actively embraced that support.[7]  What becomes immediately apparent from a review of various Internet postings and dialogues about Ms. Mason is that the extremist community is populated by paranoid fanatics who confuse the prosecution of a career arsonist with the persecution of a political activist, who imagine that they live in a totalitarian police state, and who have no regard for the law.

It was, apparently, this audience that Ms. Mason was addressing when she wrote the article: "My Green Scare Arrest – Or, why does it take 30 cops to arrest one person?  Couldn't be anything about creating public hysteria against forest defenders, could it?" that was published in the Summer 2008 edition of the "Fifth Estate" periodical.[8]  Although the bulk of the article is simply a narrative from Defendant's perspective about her arrest, transport to this District, and subsequent release on bond, Defendant's closing comments provide a telling insight into her Weltanschauung:

> It gives me so much hope to see such solidarity.  As a strong community of resistance, we can withstand the repression of the state and continue to fight for the Earth everywhere.  Stay strong, I am with you in spirit.  My time may be done, but your is just beginning.

---

[7]The Government's reference to "support" is not meant to include the various efforts by Ms. Mason's friends to raise funds for her legal defense, to provide her with extra health and comfort items during her confinement, or to simply offer moral support as this case has proceeded.

[8]Although the article can be accessed online, several hard-copies of the magazine were located in plain view during the execution of the search warrant (Case No. 1:08-MJ-649) in December 2008 of the residence where Ms. Mason resided while on bond.  The Government will provide an excerpt of same at sentencing.

Marie Mason, <u>My Green Scare Arrest</u>, Fifth Estate (Summer 2008).[9]  (Gov't Ex. 6).

At the same time that Defendant was penning her "Green Scare Arrest" article, and while she was on this Court's bond subject to an order prohibiting contact with persons involved in illegal eco-defense activities, Defendant was in regular contact with members of the I-69 group. Between May 26 and September 11, 2008, Defendant had telephone contact on 27 occasions with two persons known to be involved in Roadblock; during this same period, there were approximately 15 actions involving I-69, ten of which occurred in Indiana.  In most cases, the calls between Defendant and one or both of the persons were made within a day or two of the incident, and in some cases calls were made the day of incidents.  Also, between March 20 and September 17, Defendant had contact with the group by electronic mail on 23 occasions.

Finally, as the sealed addendum[10] to this Memorandum demonstrates, Defendant's loyalty to cause and compatriots continues to be far more important to her than either the laws of the United States or the authority of this Court.[11]  That is not surprising, however, given that these loyalties are also more important to Defendant Mason than her own well-being, something she demonstrated some time ago when she rejected the opportunity to negotiate a much more

---

[9]Judging from the balance of the edition, Ms. Mason did not mistake her readership.

[10]Ms. Mason's counsel will be provided a copy of the addendum in advance of sentencing.

[11]Notwithstanding the natural tendency to admire loyalty, the trait of loyalty is in fact value-neutral, and whether it is a social good depends on the object of that loyalty.  Intense loyalty to a criminal enterprise or movement does not mitigate the severity of acts committed on behalf of that enterprise or movement, but suggests instead a significant need for both specific and general deterrence.  Loyalty to street gangs, racial supremacist groups, or organized crime families of La Cosa Nostra may be highly valued by members of those groups, but is not admired by the law-abiding public.

favorable plea-agreement with the Government by refusing to assist ongoing investigations. While this non-cooperation cannot be considered a basis to increase the advisory Guideline sentence, USSG § 5K1.2, the Government submits that it is relevant to assessing the Defendant's characteristics, the need for specific and general deterrence, and the need to protect the public. 18 U.S.C. § 3553(a) .

<u>Defendant Mason's Guideline Objections</u>

Defendant Mason objects to the proposed application of USSG § 3B1.1(b) and the resulting three-level enhancement on an evidentiary basis, specifically, that her account of the offense conduct differs from that provided by co-defendant Frank Ambrose.  Defendant does not dispute that at least five persons were involved in the logging-equipment arson alleged in Count 4, but maintains that she essentially had nothing to do with making the decision to commit the arson, recruiting the others as participants, or directing the execution of the plan.  The Government will present testimony from FBI Special Agent (SA) James K. Shearer concerning Ambrose's account of the incident, and concerning the content of a recorded conversation between Ambrose and Defendant, that demonstrates Defendant's managerial role.

Defendant Mason also objects to the proposed application of USSG § 3A1.4 and the resulting 12-level enhancement on the basis that it overstates the seriousness of the offense.  That is an argument in support of departure from a Guideline range pursuant to USSG § 5K2.0(a), not an argument against application of an enhancement in the first place.  The technical applicability of the enhancement is beyond dispute, not least because Defendant stipulated in her plea-agreement that the offenses of conviction "involved, or were intended to promote, a 'Federal crime of terrorism' as that term is defined in 18 U.S.C. § 2332b(g)(5)."  PSR at 11, para. 25;

12

Plea-agreement at 10, para. 5.P.  Accordingly, the enhancement clearly applies.  United States v. Graham, 275 F.3d 490, 516 (6th Cir. 2001) (upholding application of terrorism enhancement in purely domestic case); see also United States v. Salim, 549 F.3d 76 (2d Cir. 2008) (same); United States v. Hale, 448 F.3d 971, 988 n.1 (7th Cir. 2006) (same); United States v. Dowell, 439 F.3d 1100, 1110-11 (10th Cir. 2005) (same); United States v. Harris, 434 F.3d 767, 772-73 (5th Cir. 2005) (same); United States v. Jordi, 418 F.3d 1212, 1216 (11th Cir. 2005) (same).

### Defendant Burthwick's Guideline Objections

Defendant Burthwick lodges a pro forma objection to application of USSG § 3A1.4 based on the fact that the offense underlying his misprision offense, the MSU arson, was purely domestic.  Def.'s Sent. Mem. at 2-3.  The objection should be overruled based on the controlling and persuasive precedent cited with respect to Defendant Mason's objection.

Defendant also objects to the enhancement on the grounds that he himself did not have the intent to intimidate or coerce anyone.  Even assuming the truth of that assertion, the enhancement should still apply.  First, the MSU arson was indisputably a Federal crime of terrorism.  Second, the offense of misprision is obstructive in nature because it requires an affirmative act of concealment or participation.  United States v. Goldberg, 862 F.2d 101, 104 (6th Cir. 1988).  Because the enhancement applies to offenses that involved "obstructing an investigation of a federal crime of terrorism,"  USSG § 3A1.4, comment. (n.2), the objection should be overruled, regardless of whether Defendant's motive was to intimidate others, to help his friends, or something in between.

### Defendant Fultz' Guideline Objections

Defendant Fultz objects to application of USSG § 2K1.4(a)(1) as the start point for the

13

Section 2X1.4 § Base Offense Level calculation on the theory that neither co-defendant Ambrose nor Mason knowingly created a substantial risk of death or injury, and because the MSU arson did not involve the destruction or attempted destruction of a facility or place of use. This objection should be overruled based on two factual conclusions that are clearly indicated from the facts. First, even though the explosion may have been unintended, any rational person would have to know that dousing gasoline all over multiple document-file cabinets and then lighting them would produce a fire of sufficient magnitude to endanger the entire building, and that if that building was in the middle of major campus, fire-fighters would have to enter the building to try and save it. See discussion supra at 5-6. It was therefore entirely foreseeable that the fire would be of a nature to pose a substantial risk to firefighters. Second, the MSU fire indisputably caused both an attempted and a consummated destruction of a government facility and place of public use. The fire caused over $1 million dollars in damage, and required a nine-month evacuation and repair. The fact that the building was not leveled does not mean the facility/place was not destroyed. Because Defendant's objection is based on the unsupported inclusion of the word "total" before the word "destruction" in Section 2K1.4(a)(1), it should be overruled.

Like Defendant Burthwick, Defendant Fultz objects to application of Section 3A1.4 to the offense of misprision. Her objection should be overruled on the same basis that his should.

Finally, Defendant Fultz objects to the fact that she has not been recommended for a minor-role adjustment. As the PSR writer correctly notes, Ms. Fultz's minor role in the offense relative to others is already accounted for by the fact that her prosecution was resolved by a plea to misprision of arson vice arson. PSR Addendum at 3. This fact is apparent not only as a matter of logic, but also as a matter of express Guideline language: "The adjustment from §3B1.2

14

(Mitigating Role) normally would not apply because an adjustment for reduced culpability is incorporated in the base offense level.  USSG § 2X4.1, comment. (n.2).  This objection should therefore be overruled.

<u>Sufficient, But Not Excessive, Sentences</u>

Defendants Burthwick and Fulz

Addressing the sentences for Defendants Burthwick and Fultz first, the Government reiterates its opening observation that neither of these defendants is in the same league as either Frank Ambrose of Marie Mason.  The conduct of Mr. Burthwick and Ms. Fultz on December 31, 1999 and January 1, 2000 was, as far as the Government is aware, aberrational.  The Government resolved their cases with pleas to much less serious misprision charges not because doing so was necessary to obtain convictions, but because it concluded that doing so was fair in the overall context of this prosecution and the investigation that produced it.  Further, throughout the course of its larger investigation, the Government has not discovered any indication that either Ms. Fultz or Mr. Burthwick had any involvement with ELF or any other advocacy-by-violence organization or movement after New Year's of  2000.  For these reasons, the Government submits that, depending on the matters they present at sentencing, both of these Defendants may be good candidates for sentences that vary below the advisory Guideline range of 36 months and below the PSR recommended sentences of 36 months.

Defendant Mason

Marie Mason is in a different class in all respects.  The kindest thing that the Government can say for her is that, to the extent that motive may ameliorate, Ms. Mason's crimes were neither motivated by a desire for personal profit or advancement nor designed to

15

inflict physical injury.  That, along with the fact that she has always maintained a civil and
courteous demeanor with agents, court officers, and the undersigned during the 11 months since
her arrest in Cincinnati, is part of what makes her a unique defendant in the Government's
estimation.

The other part of what makes Ms. Mason unique is far less complimentary.  At root, Ms.
Mason's course of conduct represents a complete rejection of how America's free society
functions.  In this country, an advocate can lawfully advance his or her cause by public protest,
by writing or saying almost anything they want to, by pursuing legal action in the courts, by
supporting certain politicians, or by becoming politically active themselves and advancing
chosen policy initiatives.  In the United States, one does not have to bully people to make a point
or to effect change, but that is what the ELF is all about, and it is at root all that they are about:
violence, arrogance, and self-righteousness.

It takes time and effort to effect change legally, because other people and other
institutions may have different priorities and different viewpoints.  Rather than engaging those
people and institutions with reason in broad daylight, ELF chooses to engage them with fire and
violence in the middle of the night.  While it may be true that Ms. Mason was not motivated by
desire for either profit or for personal revenge, but by a desire to effect political change, her
motivation can hardly have mattered to the people and institutions whose property she burned out
or vandalized.

Moreover, and unlike Frank Ambrose, Marie Mason apparently never came to the
recognition that what she was doing was profoundly wrong.  Instead, her commitment to the eco-
extremist mind-set and its methods continued until her arrest and, apparently, after her arrest.  In

16

the process she has become a figure of admiration to that community, a portion of whose membership continues to bully, threaten and destroy.  For these reasons, the Government submits that this case presents an exceptionally strong need for specific and general deterrence, for a sentence that promotes respect for law, and for a sentence that will protect the public.

The Government bound itself in the plea-agreement not to advocate for a sentence in excess of 240 months, and it did so knowing that such a sentence would be well below the bottom of the advisory Guideline range.  Notwithstanding the matter set forth in the sealed addendum, which could arguably justify the Government's withdrawing from that part of the agreement, the United States chooses to abide by its earlier promise.  It does so because a sentence of 240 months would still constitute the most onerous sentence ever imposed in a prosecution of this sort, because the PSR writer recommends that sentence, and because the Government thinks that such a sentence would satisfy its law-enforcement interests in light of all the facts and circumstances of the offenses, the offender, and the larger problem that she helped to create.

Accordingly, the United States respectfully recommends that Defendant Mason receive a sentence that includes 240 months in the custody of the Federal Bureau of Prisons.

Respectfully submitted,

DONALD A. DAVIS
United States Attorney


Dated: 30 Jan. 2009                              /s/  H.W. Frank
                                            HAGEN W. FRANK
                                            Assistant United States Attorney

17