```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE WESTERN DISTRICT OF MICHIGAN

 3                            SOUTHERN DIVISION

 4

 5     UNITED STATES OF AMERICA,

 6                 Plaintiff,

 7       v.                              CASE NO:  1:08-CR-47

 8     MARIE JEANETTE MASON,

 9                 Defendant.

10     _____/

11                            * * * *

12                        SENTENCING HEARING

13                            * * * *

14

15     BEFORE:   THE HONORABLE PAUL L. MALONEY
                 United States District Judge
16                 Lansing, Michigan
                 February 5, 2009
17
       APPEARANCES:
18
       APPEARING ON BEHALF OF THE PLAINTIFF:
19
                 HAGEN W. FRANK
20               Assistant United States Attorney
                 P.O. Box 208
21               Grand Rapids, Michigan  49501-0208

22     APPEARING ON BEHALF OF THE DEFENDANT:

23               JOHN R. MINOCK
                 339 East Liberty Street, Suite 200
24               Ann Arbor, Michigan  48104

25
```

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

```
 1                       I N D E X

 2   WITNESS:                                      Page

 3   JAMES K. SHEARER - Government Witness

 4        Direct Examination by Mr. Frank           5
          Cross Examination by Mr. Minock          38
 5        Redirect Examination by Mr. Frank        41
          Recross Examination by Mr. Minock        44

 6

 7

 8

 9                       * * * *

10                  Lansing, Michigan

11                  February 5, 2009

12                  at approximately 9:25 a.m.

13                  PROCEEDINGS

14        THE COURT:  This is 08-47; The United States of

15   America vs. Marie Mason.  This matter is before the Court for

16   sentencing.

17        The Court's file reflects that on September 11, of

18   the year 2008, the defendant pled guilty before Magistrate

19   Judge Ellen Carmody to Counts One, Two and Four of the

20   Indictment.  This plea was accepted by the Court on September

21   26, of the year 2008.

22        The Court accepts the plea agreement in this case

23   finding the charges pled to adequately reflect the seriousness

24   of the actual offense behavior.  I note from the record that

25   the plea agreement is from three districts of the country, in
```

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

file:///A|/020509MM.txt

3

1    addition to this district, the Eastern District of Michigan and

2    the Southern District of Indiana.

3            I know that there are several objections to the

4    presence investigation report as it relates principally to

5    the guideline scoring, which will-- which we will resolve

6    during the course of this hearing.

7            I want to note for the record that the government is

8    represented by Assistant United States Attorney Hagen Frank.

9    Also present is the United States Attorney Donald Davis.

10           The defendant is represented by Attorney John

11   Minock.  The defendant is present in person.

12           The Court has tentatively scored this case under the

13   United States Sentencing Guidelines at Offense Level 38,

14   Criminal History Category VI, resulting in a guideline range

15   for Counts One and Four of 240 months, and on Count Two, the

16   guideline range is 360 months to 480 months.  The Court

17   recognizes that those guideline ranges and the guidelines are

18   advisory to the Court pursuant to United States Supreme Court

19   caselaw.

20           And as I say, we have numerous objections to the

21   presence investigation report that we will resolve during

22   the course of the hearing.

23           Mr. Minock, have you had the opportunity, sir, of

24   reviewing the presence investigation report with your

25   client?


                KATHLEEN S. THOMAS, U.S. District Court Reporter
             410 West Michigan Avenue, Kalamazoo, Michigan  49007
                            (269)385-3050

1           MR. FRANK:  Yes, I have.

2           THE COURT:  All right.  Is that correct, Ms. Mason,

3   you have had ample opportunity to review the presentence

4   investigation report with your lawyer, Mr. Minock?

5           THE DEFENDANT:  Yes, I have, your Honor.

6           THE COURT:  Are you satisfied with his work and

7   representation of you?

8           THE DEFENDANT:  Yes, I am.

9           THE COURT:  Thank you.  All right.  Thank you.

10          Mr. Frank, are you moving third level of acceptance?

11          MR. FRANK:  We are, your Honor.

12          THE COURT:  That motion is granted.  That does not

13  change the guideline range as previously stated by the Court,

14  because the Court anticipated the making of the motion and the

15  granting of it.

16          As I've indicated, there are numerous objections to

17  the presentence investigation report.  I had a short conference

18  with counsel in chambers.  It's my understanding the government

19  wishes to call witnesses-- a witness, is that correct,

20  Mr. Frank?

21          MR. FRANK:  It is, sir.

22          THE COURT:  Thank you.  You may proceed.

23          MR. FRANK:  Thank you, your Honor.

24          Government calls Jim Shearer, Special Agent FBI.

25          THE COURT:  Agent, please step forward and be sworn.

```
 1              JAMES K. SHEARER - GOVERNMENT WITNESS - SWORN
 2              COURT CLERK:  State your full name and spell your
 3   last name for the record, please.
 4              THE WITNESS:  James K. Shearer, S-h-e-a-r-e-r.
 5                          DIRECT EXAMINATION
 6   BY MR. FRANK:
 7   Q.   And as I said, you are a special agent with the FBI?
 8   A.   Yes, sir.
 9   Q.   How long have you been at the Bureau?
10   A.   Approximately four years.
11   Q.   As a special agent all that time?
12   A.   Yes, sir.
13   Q.   And before that, did you have any law enforcement
14   experience?
15   A.   I served five years with Wilmington Police Department, in
16   Wilmington, North Carolina.
17   Q.   Where are you presently assigned?
18   A.   Grand Rapids resident agency, assigned to the Detroit
19   field division.
20   Q.   How long have you been with the Grand Rapids agency?
21   A.   Four years.
22   Q.   You were the lead agent investigating the case before this
23   Court; is that correct?
24   A.   Yes, sir.
25   Q.   And did your investigation, your active investigation of
```

1    this case begin roughly about April of 2007?

2    A.   That would be correct.

3    Q.   You have a lot of experience and training investigating

4    this sort of case, specifically eco-extremist activities?

5    A.   Yes, sir.

6    Q.   Before we came in today, you and I sat down and sort of

7    prepared for what we were going to do today and went through a

8    power point that consists of some video and various digital

9    images of things and such; is that correct?

10   A.   Correct.

11   Q.   And is the first thing in that presentation excerpts of

12   the video of the fire at Agricultural Hall of Michigan State

13   University?

14   A.   Yes.

15   Q.   Is that fire the subject of Counts One and Two of the

16   charges before this Court?

17   A.   I believe so.

18   Q.   The MSU arson on December 31st, 1999?

19   A.   Yes.

20   Q.   Let's take a look at that video.  Now, this video, this is

21   not the video of the entire fire, is it?

22   A.   No.  This-- I believe this is a video that was documented

23   by Michigan State University Police Department to capture, and

24   the fire department to capture the fire as it was in act.

25   Q.   What we are going to show the Court though is just

1   segments of that even shorter video; is that right?

2   A.   Yes.

3            (Playing video.)

4   BY MR. FRANK:

5   Q.   The sounds that we are hearing, this is the-- would I be

6   correct, this is the emergency frequency the firemen are using?

7   A.   I believe so, yes.

8   Q.   That reference to a 77-year-old injured man, that is some

9   other event that's happened?

10  A.   From what I've been informed, it was totally unrelated.

11  Q.   There was not an injury in this fire in regards to the

12  defendant?

13  A.   Yes.

14  Q.   Go ahead.  And by the way, is this Agricultural Hall?

15  A.   Yes.

16  Q.   Is this the fire on New Year's Eve, 1999?

17  A.   Yes.

18            MR. FRANK:  All right.

19            (Playing video.)

20  BY MR. FRANK:

21  Q.   Could you point out on the screen in front of you exactly

22  where the offices of Dr. Catherine Ives of Michigan State

23  University, where they were located?

24  A.   I believe, as I recall, they were-- it was in this corner

25  of the building where basically where the, it looks like the

```
 1  majority of the fire was contained.

 2          (Playing video.)

 3  BY MR. FRANK:

 4  Q.   Now, you-- Is it safe to say, you've seen this video

 5  umpteen times?

 6  A.   Numerous, yes.

 7  Q.   At one point is it-- can you see that firemen are between

 8  the burning floor there where the offices were and the roof

 9  that's also on fire?

10  A.   Yes.

11  Q.   Okay.  And let's go, hopefully, go to that segment.

12          (Playing video.)

13  BY MR. FRANK:

14  Q.   Okay.  And again, you've listened to this a bunch of

15  times?

16  A.   Yes, sir.

17  Q.   What was just said, since you've listened to this so many

18  times, what was said there a second ago?

19  A.   I believe that was one of the on-scene commanders

20  instructing the search team that had entered the building to

21  battle the blaze that they had noticed their flashlights and

22  that they were actually a floor higher than where they needed

23  to be.

24  Q.   You were a floor too high?

25  A.   Yes.
```

KATHLEEN S. THOMAS, U.S. District Court Reporter
           410 West Michigan Avenue, Kalamazoo, Michigan  49007
                          (269)385-3050

```
 1   Q.    Then what are we going to be seeing up here, and if you
 2   can circle the area where the lights of the fire fighters come
 3   into view.
 4            Thank you.
 5            (Playing video.)
 6   BY MR. FRANK:
 7   Q.    Then at one point getting on toward the end of the video
 8   after they have managed to make entry into the room, is there
 9   footage of a fireman actually coming up to the main window of
10   the office?
11   A.    Yes.
12            (Playing video.)
13   BY MR. FRANK:
14   Q.    All right.  Now, this window here, based on the results of
15   your investigation, was there an explosion when that fire was
16   initially lit?
17   A.    Yes.
18   Q.    Okay.  And what was the effect on one of those windows?
19   A.    From what happened at the fire, apparently gas fumes
20   exploded in the side of the building blew out one of the-- not
21   this window here, but the one directly to the right of it-- out
22   of the building fully intact, which obviously is consisted of
23   two large glass panes.
24   Q.    That is the window that filled that whole space that
25   fireman was standing in?
```

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1   A.   Yes.

2              (Playing video.)

3   BY MR. FRANK:

4   Q.   Okay.  We see the fireman right there; is that correct?

5   A.   Yes.

6              (Playing video.)

7   BY MR. FRANK:

8   Q.   Okay.  What is this displayed on the screen right now?

9   A.   This would be a map of the campus of Michigan State

10  University in East Lansing.

11             MR. FRANK:  For the record, that's been marked

12  government Exhibit 2-A.

13  BY MR. FRANK:

14  Q.   Would you circle where Agricultural Hall is located.

15             Thank you.

16             MR. FRANK:  Let's go to Exhibit 2-B, please.

17  BY MR. FRANK:

18  Q.   And kind of obvious, but what is this?

19  A.   The Agricultural Hall after the fire had been

20  extinguised.

21  Q.   And which window--  Where was the window blown out?

22  A.    It's this second window on the right side of the building.

23             MR. FRANK:  Let's go to 2-C.

24  BY MR. FRANK:

25  Q.   And that is the same structure from a front view, correct?


                 KATHLEEN S. THOMAS, U.S. District Court Reporter
                410 West Michigan Avenue, Kalamazoo, Michigan  49007
                              (269)385-3050

1    A.    Correct.

2    Q.    Okay.  Where did the window that was blown out, where did

3    that land?

4    A.    Approximately, you can see where the crime scene tape is

5    roping it off.

6              MR. FRANK:  Let's go to 2-D.

7              THE COURT:  Agent, is that a bike rack?

8              THE WITNESS:  Yes, sir.

9              THE COURT:  That the window fell on?

10             THE WITNESS:  It was right next to a bike rack, your

11   Honor.

12             THE COURT:  Thank you.

13   BY MR. FRANK:

14   Q.    And 2-D is just another exterior picture showing roof

15   damage.

16             MR. FRANK:  Let's go to 2-E.

17   BY MR. FRANK:

18   Q.    What is that?

19   A.    That would be the window that was blown from the

20   building.

21   Q.    What, in your estimation, is one of the significant

22   things-- I mean what demonstrates this thing came out of the

23   window intact, out of the aperture intact?

24   A.    As you can see the framing structure of the window.

25   Windows are usually affixed to the building, remained intact.


                KATHLEEN S. THOMAS, U.S. District Court Reporter
             410 West Michigan Avenue, Kalamazoo, Michigan  49007
                            (269)385-3050

1    The insulation also that is typically all around the exterior

2    portion of the window frame were all intact along with the

3    window structure itself.

4    Q.    And I just circled that appear to be stacked 2 x 4's,

5    that's actual framing structural material, right?

6    A.    Yes, sir.

7    Q.    Let's go to--  And incidentally, where is the window--

8    appears to be straddling grass, and is that sidewalk there that

9    covers the top side?

10    A.    Yes, sir.

11            MR. FRANK:  Let's go to 2-F.

12    BY MR. FRANK:

13    Q.    Again, another shot of the window?

14    A.    Yes, sir.

15    Q.    And what is immediately behind the window there?

16    A.    As you can see, there is a, looks like-- appears to be a

17    guardrail along with a bike rack.

18    Q.    To your knowledge, Miss Mason stipulated to a quite a few

19    other actions on behalf of Earth Liberation Front as part of a

20    plea agreement, right?

21    A.    That is correct.

22    Q.    Was one of those actions the attempted fire bombing of a

23    bottled water pumping facility in September, 2003, in Mecosta

24    County?

25    A.    Yes.

1   Q.   We are displaying Government Exhibit 4-A.  What is that a

2   picture of?

3   A.   Picture from the inside of that pumping station that you

4   just mentioned owned by the Ice Mountain bottling plant in

5   Stanwood, Michigan.

6   Q.   Okay.

7   A.   I'm sorry, Stanton.

8   Q.   And the broken window there.  How come the window is

9   broken?

10  A.   Apparently that would be how whoever broke into the

11  facility and attempted to fire bomb same gained entry into the

12  structure.

13  Q.   In fairness to Ms. Mason, does the FBI have any direct

14  evidence that she is the one who actually made entry into that

15  structure?

16  A.   No.

17  Q.   Is the device itself, the incendiary device, is that

18  depicted in that photo?

19  A.   One of them, yes.

20  Q.   Can you circle it, please.

21       And then what is this panel that I've just circled

22  that it's sitting on?

23  A.   It appears to be an electrical junction box or control

24  panel for the machinery or equipment that's located inside the

25  pump station.


                KATHLEEN S. THOMAS, U.S. District Court Reporter
                410 West Michigan Avenue, Kalamazoo, Michigan  49007
                              (269)385-3050

```
 1                MR. FRANK:  Let's go to 4-B.

 2   BY MR. FRANK:

 3   Q.   What is this a picture of?

 4   A.   It's a picture of a fuel trail and another device that was

 5   left behind inside the facility.

 6                THE COURT:  Is that gasoline?

 7                THE WITNESS:  Our lab results indicated it was a

 8   mixture of either diesel fuel, gasoline or just oil-- motor oil

 9   and gasoline.

10   BY MR. FRANK:

11   Q.   And then this bottle there appears to be a big plastic jug

12   with something taped to it.  What exactly is that?

13   A.   It is a-- it was a pop or soda two-liter bottle containing

14   some more of this flammable liquid, affixed to it with duct

15   tape or I should say tape, was a sponge also soaked in that

16   same liquid.

17   Q.   And were there several of these other bottles scattered

18   around the facility?

19   A.   Yes, sir.  I believe there was a total of four in the

20   facility with a trail running from each of these devices

21   throughout the building.

22   Q.   And these are photos of the facilities, you know, as

23   employees found it that morning and as law enforcement found

24   it; is that correct?

25   A.   Correct.
```

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1            MR. FRANK:  Let's go to 4-C.

2   BY MR. FRANK:

3   Q.   What is that a picture of?

4   A.   This would be the initial device placed right next to the

5   window, as you saw in a few slides before, next to the actual

6   panel.

7   Q.   4-D?

8   A.   Correct.

9   Q.   Same thing from a different angle?

10  A.   Yes, sir.

11  Q.   What are we looking at in that can that is north of--

12  above the liter jug full of flammable liquid?

13  A.   This--  It is a timing-- timer that had been rudimentary

14  timer that had been affixed to this device with an igniting

15  source.

16  Q.   The timer is just that kitchen egg timer there?

17  A.   Correct.

18  Q.   And what is this that's right next to it?

19  A.   That would be a battery power source for the-- that would

20  deliver the current to the ignition source that was affixed to

21  the actual device.

22  Q.   Okay.  And then this object here that sort of seems to be

23  affixed to the side of the bottle?

24  A.   That would be a--  What would happen is the ignition

25  source was set up to be a model rocket engine that was affixed

                KATHLEEN S. THOMAS, U.S. District Court Reporter
            410 West Michigan Avenue, Kalamazoo, Michigan   49007
                            (269)385-3050

1    to the electronic or electric currents or wires affixed to the

2    electric currents on the timing device.

3    Q.   Okay.  So then, if you can just explain to the Court in

4    brief, how does this work in relationship to the timer, the

5    power source, these wires, that fuse, that sponge and that

6    bottle of stuff and the oil trail?

7    A.   Basically there's two wires running from the battery

8    source one of them from the actual kitchen timer there, which

9    also has a piece of wire affixed to the actual spinning timer.

10   That piece of metal would then connect the circuit from the two

11   wires to the battery which would cause a spark, which was

12   affixed to the fuse on the model rocket engine, which would

13   then ignite and trigger the model rocket to burn, produce a

14   flame, that would in turn ignite the sponge that was affixed to

15   the bottle of flammatory liquid.

16   Q.   All right.  What was supposed to happen at that point?

17   A.   Either the plastic would melt or the fire on the outside

18   got hot enough there was enough combustion in the bottle, I

19   would assume it would have exploded, thus disbursing flammable

20   liquid to the floor and igniting the additional flammable

21   liquid and the additional devices located within the building.

22   Q.   Okay.  Now, from this picture and also from examination of

23   the scene at the time, were authorities-- were investigators

24   able to determine whether this device was actually activated?

25   A.   Yes.

                KATHLEEN S. THOMAS, U.S. District Court Reporter
           410 West Michigan Avenue, Kalamazoo, Michigan  49007
                            (269)385-3050

1    Q.    How did they know that?

2    A.    As you can see, very top portion of the sponge has a singe

3    mark where apparently, I don't believe it was this model rocket

4    engine, there was a second engine that may have actually

5    ignited, but had detached from the device, when it did ignite.

6          MR. FRANK:  All right.  Let's go to 4-E.

7    BY MR. FRANK:

8    Q.    And that's just another shot of the whole timing device?

9    A.    Correct.

10         MR. FRANK:  Let's go to 4-F.

11   BY MR. FRANK:

12   Q.    Is that just a close-up there of where the-- this fuse

13   actually went off and burned the corner of the sponge there?

14   A.    Correct.

15         MR. FRANK:  And let's go to 4-G.

16   BY MR. FRANK:

17   Q.    And what is that a picture of?

18   A.    This is just another shot of the inside of the facility

19   depicting what was located in the structure.

20   Q.    Now, somebody obviously tried to burn up the pumping

21   station.  Did any person or group claim responsibility for it

22   right afterwards?

23   A.    Yes, they did.  Earth Liberation Front.

24         MR. FRANK:  Let's go to Government Exhibit 5.

25   BY MR. FRANK:


                KATHLEEN S. THOMAS, U.S. District Court Reporter
           410 West Michigan Avenue, Kalamazoo, Michigan  49007
                            (269)385-3050

1   Q.   What is this?

2   A.   This was a communique posted on the Earth Liberation Front

3   press office website at the time claiming responsibility for

4   the attack at the Ice Mountain pump station.

5   Q.   Okay.  Then we just--  So this is the ELF, Earth

6   Liberation Front, announcement taking responsibility for Ice

7   Mountain?

8   A.   Correct.

9   Q.   Okay.  What--  Would you just read into the record what

10  that says in the top paragraph, the blown-up part?

11  A.   After "begin"?

12  Q.   "Although"?

13  A.   "Although the incendiaries failed to ignite, the ELF has

14  sent a message that the commodification of water is an attack

15  on a fundamental right of all beings and must be stopped."

16  Q.   And then if you go down to the last blown-up paragraph.

17  If you just read that first sentence into the record?

18  A.   "On the night of Sunday, the 21st of September, the ELF

19  penetrated the perimeter fence of an area of land used for

20  canned hunts.  This particular location is a short distance

21  from Rodney, Michigan, near 13 Mile Road and M-20, is home to

22  the pumping stations that supply the Perrier bottling plant in

23  Mecosta County.  Access to one of the pumping stations--"

24  Q.   All right.  That's fine.

25       MR. FRANK:  Second page, please.

1   BY MR. FRANK:

2   Q.   In the communique itself, over the last dozen words, if

3   you would read that.  Just start with, "Water."

4   A.   "Water for life, not for profit.  Welcome to Michigan.

5   ELF."

6   Q.   That "not for profit" slogan, does that appear elsewhere--

7   did you come across that repeatedly in your investigation?

8   A.   Yes, we did.

9   Q.   Just in general terms, how and when?

10  A.   The water for life, not for profit was a slogan used by

11  Miss Mason's above-ground-- what we call the above-ground

12  activist group Sweetwater Alliance that was protesting the Ice

13  Mountain operations.

14  Q.   Okay.  That was going to be the next question was:  Why

15  did someone apparently want to burn up a bottled water pumping

16  station?  Had it--  Had that site been the object of

17  above-ground or lawful protest activity?

18  A.   There was some concern apparently Miss Mason's group had

19  some concerns regarding what effect that Ice Mountain or

20  Nestle's water pumping operation would have on the aquifers and

21  environment in the Mecosta County area from which they were

22  acquiring and pumping the water from.

23  Q.   What we have been talking a lot about the Earth Liberation

24  Front, let's develop a short record of exactly what ELF is and

25  where it came from and what it has claimed responsibility for

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1   across the country.  First off, there is a related

2   organization, isn't there, Earth First?

3   A.   That is correct.

4   Q.   Also designated by capital E capital F and exclamation

5   mark?

6   A.   Yes.

7   Q.   Briefly, what is Earth First and where did it start?

8   A.   Earth First is an environmental activist/extremist group

9   that believes in the use of civil disobedience, criminal acts

10  to further its defense of, you know, what they deem

11  environmentally unsound practices by businesses and individuals

12  that are harmful to the environment.

13  Q.   Roughly when did Earth First get its start?

14  A.   Rough estimates indicate Earth First was established about

15  right around 1980-- 1979, 1980.

16  Q.   And then, what is the Earth Liberation Front and what, if

17  any, is its relationship to Earth First?

18  A.   Basically what happened is Earth-- the Earth Liberation

19  Front is kind of a splinter cell from the Earth First

20  organization.  Towards the end of the '80s, the Earth First

21  organization decided to move more towards a movement type

22  position which kind of move away from being an organization, at

23  that point some individuals with ties to the Earth First group

24  spun away and formed Earth Liberation Front, sometime around

25  1991-92.

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1   Q.   What is the principal difference between Earth Liberation

2   Front and Earth First?

3   A.   Earth Liberation Front believes in the use of more severe

4   tactics, they are a more radical group that basically the

5   individuals that believed to have broken away from the Earth

6   First group have more radical beliefs and more ties to the

7   anarchist movement in the 1980s that basically influenced the

8   development of Earth Liberation Front's tactics, which tend to

9   mimic the Animal Liberation Front.

10          MR. FRANK:  Let's go to Government Exhibit 3.

11  BY MR. FRANK:

12  Q.   And what is Government Exhibit 3?

13  A.   This is a posting as it appears today on the Earth

14  Liberation press office website or claiming responsibility for

15  the arson at Michigan State University.

16  Q.   Then this is an on-line draft of--  When was this

17  announcement first made?

18  A.   I believe it was January of 2000 when it was first posted

19  on the website.

20  Q.   And-- well, the Court can read that for itself, but just

21  in very general terms, what does that establish or what does

22  that claim, what relationship does that claim between ELF and

23  the MSU arson?

24  A.   Basically claims that the act itself was committed on

25  behalf of the Earth Liberation Front.  And that specifically

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    the strike was to target one specific researcher at Michigan

2    State.

3    Q.   And who was responsible for drafting that communique or

4    one very similar to it?

5    A.   Miss Mason.

6    Q.   Since the 1990s, has there been a pattern of ELF claiming

7    responsibility for acts of property destruction, both arson and

8    vandalism?

9    A.   Yes.

10   Q.   What is the total loss-- again, very, very general terms--

11   the total economic loss caused by actions claimed by ELF--

12   excuse me, as result of actions claimed by ELF, what is in very

13   general terms the economic loss been?

14   A.   Well over a hundred million dollars to date.

15   Q.   Let's switch to some of your specific investigative

16   activities in this case.

17            In April 2007, you executed a search warrant issued

18   by this Court for the residence of Frank Ambrose in the Eastern

19   District of Michigan, right?

20   A.   Correct.

21   Q.   After you executed that search warrant, did you develop

22   Frank Ambrose as a cooperating or as a confidential informant?

23   A.   Yes, we did.

24   Q.   And working with him in that capacity, did he do

25   consensual recordings of conversations he was having with other

 1   people?

 2   A.   Yes.

 3   Q.   In-person conversations?

 4   A.   Yes.

 5   Q.   Telephone conversations?

 6   A.   Yes.

 7   Q.   The recording quality of those conversations, were they

 8   always crystal clear or did they vary?

 9   A.   No, they ranged in variance from unintelligible where we

10   were unable to, you know, transcribe or even identify words

11   being said on those tapes, to very good.

12   Q.   Okay.  And then fair to say that Mr. Ambrose also sat down

13   with you and gave proffers of information, that is, he just

14   told you things he knew?

15   A.   Yes.

16   Q.   In the time that you were working Mr. Ambrose from April

17   of '07, I mean did you have just a few-- in very general terms,

18   describe the amount of contact you had with him?

19   A.   Hundreds.

20   Q.   And when he would--  Did he travel outside of Michigan in

21   connection with this investigation?

22   A.   Yes.

23   Q.   When he did that, did you go with him?

24   A.   Yes, sir.

25   Q.   One of those conversations that you had with Mr. Ambrose,

1    did he tell you about something called Buffalo Trace Earth

2    First that he was-- he had been involved in with Miss Mason?

3    A.   Yes, sir.

4    Q.   What was Buffalo Trace Earth First?

5    A.   Basically, according to what Mr. Ambrose informed us, it

6    was an Earth First group chapter he and Miss Mason had

7    established in Bloomington, Indiana, right around the time

8    frame of 19-- right around '99, 2000, wherein they were

9    actively involved in protesting various environmental forestry

10   and campaigns to include the construction of the I-69 corridor

11   through Indiana.

12   Q.   This is back in the '99, 2000 time frame?

13   A.   Yes.

14   Q.   Did people involved with Buffalo Trace Earth First also

15   commit criminal acts in opposition to I-69?

16   A.   Yes.  After numerous discussions with Mr. Ambrose, yes, he

17   identified members of that organization that committed acts on

18   behalf of Earth Liberation Front.

19   Q.   In Miss Mason's plea agreement she stipulates to a

20   property destruction in 2000 involving Crider and Crider

21   Equipment, that damage estimate was $550,000.  Was she involved

22   in that?

23   A.   Yes, sir.

24   Q.   Okay.  Mr. Ambrose?

25   A.   Yes.


               KATHLEEN S. THOMAS, U.S. District Court Reporter
            410 West Michigan Avenue, Kalamazoo, Michigan  49007
                            (269)385-3050

1   Q.   A guy named David Agranoff?

2   A.   Yes, sir.

3   Q.   As we speak right now, what is the status of I-69

4   construction?

5   A.   They, I believe this past spring in 2008, they initiated

6   construction phase on another corridor going through

7   Evansville, Indiana, I believe is the location.

8   Q.   And has there been opposition to that?

9   A.   Yes.

10  Q.   Has all of that opposition been lawful?

11  A.   No.

12  Q.   In general terms, what is some of the unlawful opposition

13  activity?

14  A.   There have been some, you know, house visitations,

15  trespassing at executives homes, office takeovers, tree sits.

16  Q.   Briefly, what is a tree sit?

17  A.   Basically it's a platform erected in an area that's under

18  protest by various activist or extremist groups that are hoping

19  to either deter development of the land or logging of the

20  land.  Basically they affix a platform high into a tree, 40 to

21  50 feet, with no way of gaining access to it.

22  Q.   So it's basically a-- it's not an arson, but just a

23  trespass to blockade developers?

24  A.   Yes.

25  Q.   Back-- did you obtain some email traffic between Ms. Mason

1   and what is the name of this group, by the way, the Earth

2   First?

3   A.   Current group that's protesting I-69 construction is known

4   as Roadblocker First.

5   Q.   Did you obtain some copies of emails between Ms. Mason and

6   Roadblock Earth First from February of 2008?

7   A.   Yes, we did.

8   Q.   And without going into real specifics, what were those

9   emails?  Did those emails talk about training?

10  A.   Yes.

11  Q.   What kind of training?

12  A.   Basically Miss Mason revealed she was interested in

13  attending the upcoming conference or training session that the

14  Roadblock Earth First members were providing specifically

15  towards climbing and other measures.

16       When I say climbing, I mean like rope with advanced

17  climbing like rock climbers, tree climbing and rappelling.

18  Q.   What is a pen register and a trap and trace device, very

19  briefly?

20  A.   Basically it's a device that's able to capture phone

21  numbers or IP addresses or email headers on various phone lines

22  or email accounts.

23  Q.   So it's an investigative tool that does not capture

24  content of communications?

25  A.   No.

file:///A|/020509MM.txt

1   Q.   It's basically who called who?

2   A.   Like a caller I.D. system, but it can be monitored live.

3   Q.   Same as a dialed number called or caller I.D.?

4   A.   Yes.

5   Q.   Was there a pen register/trap and trace up on Ms. Mason's

6   phone she was believed to be using while she was on bond?

7   A.   Yes.

8   Q.   In this case?

9   A.   Yes.

10  Q.   And what did that indicate about contact between her and

11  couple of people involved with Earth First-- with Roadblock

12  Earth First?

13  A.   Pen trap and trap and trace showed Miss Mason was in

14  contact with individuals known to have been involved in some of

15  the illegal activities in Indiana.

16  Q.   You say known, are they people who are suspects?

17  A.   No, some of them were actually have been arrested for some

18  of their activities.

19  Q.   So between May and September of 2008, how many times was

20  she in phone contact with these people?

21  A.   My rough-- I don't know off the top of my head, I would

22  say two dozen.

23  Q.   And during that time, how many illegal actions, not

24  legitimate protests, but how many illegal actions related to

25  I-69 were there?


                KATHLEEN S. THOMAS, U.S. District Court Reporter
            410 West Michigan Avenue, Kalamazoo, Michigan  49007
                            (269)385-3050

1   A.   I believe last total was twenty, a little bit-- right

2   around twenty.

3   Q.   Did you do sort of a pattern analysis of the calls and the

4   actions?

5   A.   Yes, we did.

6   Q.   And what did that disclose?

7   A.   That during the majority of these incidents in Indiana,

8   Miss Mason either received a phone call or email from some of

9   these individuals within 48 hours, anywhere from 48 hours to

10  the date of the incident.

11  Q.   Day of the incident, was there a phone conversation

12  between her and a couple of these people the day of the tree

13  sit?

14  A.   Yes, there was.

15  Q.   And this was while she was on bond?

16  A.   Yes.

17  Q.   Subject to an order not to have contact with people

18  engaged in illegal eco-advocacy?

19  A.   Yes, sir.

20  Q.   You've listened to a lot of recordings of conversations

21  between Ms. Mason and Frank Ambrose, right?

22  A.   Correct.

23  Q.   Did you get a sense--  And during these times, were they

24  talking about illegal activities they had done on behalf of

25  Earth Liberation Front?

1   A.   Yes, sir.

2   Q.   During all those conversations, did you get a sense of

3   whether one of them was leading the other, whether the group--

4   did you get a sense of the relative power relationship between

5   the two of them as they were talking about these things they

6   had done?

7   A.   My opinion--

8         MR. MINOCK:  Objection, speculative.

9         MR. FRANK:  Your Honor, asking if based on his

10  conversation he got a sense, he either does or doesn't have a

11  sense, you know, how they-- how they spoke about these

12  incidents when they would talk about them.

13        THE COURT:  I'll take the question and the answer and

14  then I think rather than a conclusion, perhaps we could,

15  assuming the proofs are there, you can get into specifics of a

16  particular conversation or one or two to highlight the basis of

17  the opinion.

18        MR. FRANK:  Yes, your Honor, we can do that.

19  BY MR. FRANK:

20  Q.   Did you get a sense of relative power relationship?

21  A.   Yes, sir.

22  Q.   Okay.  What was that, sir?

23  A.   Majority of the conversations Mr. Ambrose and Miss Mason

24  would frequently refer to the acts in a sense of we, you know,

25  planned or carried out or along those lines.  I wouldn't say

1    they identified one or the other as the, so to speak, more

2    dominant in regards to planning or execution of any of these

3    acts.

4    Q.   The tone of the conversation was equals?

5    A.   Yes.

6    Q.   Did that include a specific conversation on January 18th,

7    2008, when they were talking about setting up for the MSU

8    arson?

9    A.   Yes.

10   Q.   In your investigation, have you come across-- again in

11   general kind of terms-- we don't want to go too far into the

12   internet because it's a pretty squishy environment, but is

13   there an active eco-extremist dialogue/community on the

14   internet?

15   A.   Very much so.

16   Q.   Bunch of different websites related to the cause?

17   A.   Yes, sir.  Yes, various posting websites, blogs.

18   Q.   And has Ms. Mason written articles or made postings on

19   those blogs that reflect her mindset?

20   A.   I wouldn't say blogs, but yes, some of her material has

21   been posted on these websites.

22           MR. FRANK:  Let's go to Government Exhibit 6, the

23   second page.

24   BY MR. FRANK:

25   Q.   Okay.  What is this?


                KATHLEEN S. THOMAS, U.S. District Court Reporter
           410 West Michigan Avenue, Kalamazoo, Michigan   49007
                          (269)385-3050

1    A.    This appears to be an article from the anarchist

2    periodical entitled Fifth Estate.

3    Q.    And the title of it--

4              MR. FRANK:  Your Honor, we are on Government Exhibit

5    6, the second page.

6    BY MR. FRANK:

7    Q.    And the title of it up there is-- or rather is that the

8    title "My Green Scare Arrest"?

9    A.    Yes, sir.

10   Q.    What does green scare refer to?

11   A.    Basically it's a title that individuals within the

12   environmental movement have coined with the government's

13   response to prosecutions of various environmental or extremists

14   in comparison referring to the red scare from the 1950s

15   regarding the Soviet infiltrators.

16   Q.    Go--  We have gone to the second page.

17             MR. FRANK:  Can you blow up the very last couple of

18   sentences in the bottom right-hand corner.

19   BY MR. FRANK:

20   Q.    And if you would just, this is Ms. Mason's words here?

21   A.    Yes.

22   Q.    Would you start and just read into the record these two

23   sentences starting with, "As a strong community."

24   A.    "As a strong community of resistance, we can withstand the

25   repression of the state and continue to fight for the earth

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    everywhere.  Stay strong.  I am with you in spirit.  My time

2    may be done, but yours is just beginning."

3    Q.    And when was this article published in Fifth Estate?

4    A.    I don't have the-- Summer of 2008 issue, I believe.

5    Q.    Did you come across a My Space page of Ms. Mason's?

6    A.    Yes.

7    Q.    Would you go to Government Exhibit 8, please.  Sir, we are

8    looking at the second page of Government Exhibit 8.  This is

9    off Ms. Mason's My Space page?

10   A.    Yes.

11   Q.    These entries were made while she was on bond?

12   A.    Appears to be.

13   Q.    Okay.  Would you just read into the record the last part

14   of the sentence-- actually just the second sentence begins, "In

15   short," just that one sentence?

16   A.    "In short, my organizing and carousing career is about to

17   take a sharp turn into the modern equivalent of a monastery."

18          MR. FRANK:  Okay.  Would you go back to full page,

19   please.

20   BY MR. FRANK:

21   Q.    Over here under heroes, who did she put down as her first

22   hero?

23   A.    Indicates Rod Coronado.

24   Q.    Who is Rod Coronado?

25   A.    Mr. Coronado is a convicted arsonist and environmental

1    animal rights extremist who has committed acts on behalf of the

2    Earth Liberation Front and Animal Liberation Front.

3    Q.    Federally convicted?

4    A.    Yes, sir.

5    Q.    Was the first of those in this district?

6    A.    It was.

7    Q.    And when was that?

8    A.    His conviction was in 1995, I believe.

9    Q.    What was he convicted for?

10   A.    1993 arson of a research facility here located on Michigan

11   State University.

12   Q.    Back in 2000, was there another conviction?  Did he get

13   another federal conviction for this kind of stuff?

14   A.    Yes.

15   Q.    When was that?

16   A.    Actually it was early last year, 2008.

17   Q.    Where was that, which district?

18   A.    I'm not sure of the district, but it was in California.

19   Q.    San Diego?

20   A.    Yes.

21         MR. FRANK:  For the record, that would be the

22   Southern District of California.

23   BY MR. FRANK:

24   Q.    What was that conviction for?

25   A.    Mr. Coronado was convicted of giving a speech on the

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    providing instructions on the construction of an incendiary

2    device.

3    Q.   And what happened out in San Diego the day before he gave

4    that speech?

5    A.   The speech occurred on August 1st, 2003.  Earlier that

6    day, a 450 unit condominium was burned to the ground in an

7    arson claimed by the Earth Liberation Front.

8    Q.   What was the dollar-- estimated dollar loss on that?

9    A.   Excess of $50 million.

10   Q.   There was January 3rd, 2008 tape recorded conversation

11   phone conversation between Frank Ambrose and Marie Mason,

12   right?

13   A.   I'm sorry?

14   Q.   Tape recorded phone conversation between Frank Ambrose and

15   Marie Mason?

16   A.   On what date?

17   Q.   The date of the tape was January 3rd, 2008.

18   A.   I believe that was an in-person.

19   Q.   In-person?

20   A.   I believe that was an in-person meeting.

21   Q.   Okay.  All right.  In that conversation, did Mr. Ambrose

22   bring up a $50 million Garden Community San Diego arson?

23   A.   Yes, at our direction, yes.

24   Q.   Okay.  And when he brought it up, did-- what did Miss

25   Mason say?

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    A.   I believe she laughed, if I remember correctly, from

2    reading the transcript.

3    Q.   All right.  And did she acknowledge knowing about that?

4    A.   Yes, she did.

5    Q.   And rather than going through the drill of handing you

6    this and asking you to read it and all that, is this your

7    recollection--  This was actually transcribed by FBI

8    intelligence analyst, right?

9    A.   Yes.

10   Q.   When Mr. Ambrose said, "Remember that was-- I mean you

11   know the one at the night before Rod."  Did Ms. Mason respond,

12   "Yeah, the night before Rod, I remember that."

13   A.   Yes.

14   Q.   And that was in reference to a $50 million San Diego

15   arson?

16   A.   Yes.

17   Q.   Back in summer of 2003, did the FBI have pen register/trap

18   and trace devices up on both Ms. Mason and Mr. Coronado?

19   A.   Yes, we did.

20   Q.   And David Agranoff?

21   A.   Yes.

22   Q.   Same guy that was active with Miss Mason and Ambrose in

23   2000 in Bloomington against I-69?

24   A.   Correct.

25   Q.   What did that pen/trap--  pen register/trap and trace

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    record in terms of call activity between Coronado, Agranoff and

2    Miss Mason?

3    A.    Beginning the day of the $50 million arson in San Diego,

4    began a call chain-- or sporadic call chain, I should say,

5    calling triangle between Miss Mason, Agranoff, and Coronado.

6    Q.    And in mid-September, were there a couple more ELF arsons

7    out in San Diego?

8    A.    Yes, there was.

9    Q.    What was the date?

10   A.    September 19th, I believe.

11   Q.    And when was Ice Mountain?

12   A.    The 21st.

13   Q.    And what happened after the 19 September-- well, the

14   arsons and attempted arson in San Diego and Ice Mountain, what

15   happened with phone traffic that week?

16   A.    Last call there was an I believe one or two calls between

17   Miss Mason and Mr. Agranoff, and at that point, all calls

18   between the three parties stopped.

19   Q.    I had marked as exhibit a whole bunch of different

20   internet websites that refer to Ms. Mason.  Rather than going

21   through all of these, what is the general-- I'll just have you

22   summarize them-- what is the general tenor of--  Well, first

23   off, is Miss Mason articles reference comments by here, are

24   they all over these websites?

25   A.    Yes, they are.

1   Q.   What is the general tenor?  How does this community view

2   Miss Mason and what she's done?

3   A.   Briefly I would surmise it as they refer to her as a

4   heroin or role model for environmental extremism.

5   Q.   And how do they view the investigation and prosecution of

6   people who do the things that she did?

7   A.   Frequently been referred to as a witch hunt.

8   Q.   Are you familiar with, in the defense submission for

9   sentencing, there is a comparison, a chart of various sentences

10  that people have gotten in similar cases in other districts,

11  one of the cases that is not mentioned is a guy named Eric

12  McDavid.  Who is Eric McDavid?

13  A.   Mr. McDavid is a-- was a radical environmental/anarchist

14  extremist from eastern California, I believe Sacramento area.

15  Q.   Okay.  And did any actions that he attempted succeed?

16  A.   Mr. McDavid was involved in leading the radical extremist

17  cell in California.

18  Q.   You don't need to go into much, sort of a minor point that

19  we are making.  Did he actually do any property damage?

20  A.   No, he did not.

21  Q.   Okay.  And what--

22          MR. FRANK:  And again, only mention this, your Honor,

23  in the context of the defense sentencing memorandum.

24  BY MR. FRANK:

25  Q.   What sentence did he receive?


                    KATHLEEN S. THOMAS, U.S. District Court Reporter
              410 West Michigan Avenue, Kalamazoo, Michigan  49007
                            (269)385-3050

1   A.   I believe it was 19 years and seven months.

2            MR. FRANK:  Thank you.  Nothing else, your Honor.

3            THE COURT:  Mr. Minock, you may inquire.

4                         CROSS EXAMINATION

5   BY MR. MINOCK:

6   Q.   Mr. Shearer--

7   A.   Yes, sir.

8   Q.   --let's talk about Mr. McDavid for a moment.  Are you

9   familiar with what the allegations against Mr. McDavid were

10  that led to that sentence?

11  A.   Yes, I do.

12  Q.   Is it not a fact, sir, that the government maintained,

13  both at trial and at sentencing, that Mr. McDavid wanted to

14  blow up a dam in Sacramento, which would have flooded the whole

15  city and made it-- would have made New Orleans, referring to

16  Katrina, look like a Sunday pancake breakfast?

17  A.   I believe so.  That's-- I knew his intent was to harm the

18  dam.

19  Q.   The government also maintained that Mr. McDavid or stated

20  that he wished he had taken part in a riot in Philadelphia

21  where a police officer had died of a heart attack, isn't that

22  right?

23  A.   I'm not familiar with that.

24  Q.   Mr. McDavid was recorded as saying that he would kill the

25  person who was the government informant in that case if he

              KATHLEEN S. THOMAS, U.S. District Court Reporter
              410 West Michigan Avenue, Kalamazoo, Michigan  49007
                            (269)385-3050

```
 1    found out she was a police officer; isn't that right?

 2    A.   Again, I'm not familiar with that part of the case.

 3    Q.   And Mr. McDavid also said that he did not care if innocent

 4    civilians died of his actions, that would just be too bad,

 5    referring amongst other things to the intent to cause the flood

 6    of the city of Sacramento; isn't that right?

 7    A.   Again, I'm not familiar.

 8    Q.   The information that--  You mentioned the information

 9    that's on the internet, there is a fair amount of information

10    out there regarding this case that is inaccurate, isn't that

11    so?

12    A.   In regards to?

13    Q.   The overall facts of the case, the possible sentences,

14    plea agreement, there's all sorts of misinformation out there,

15    isn't there?

16    A.   I guess.

17    Q.   Have you looked at the postings on those blogs?

18    A.   Yes, I have.

19    Q.   Let's go back to the beginning then for just a moment.

20    When you debriefed Mr. Ambrose, he told you that the fire that

21    we saw-- the horrific fire we saw the videotape of, was not

22    supposed to happen, isn't that right?  He told you that there

23    was no intention to cause an explosion or a fire of that

24    magnitude; isn't that right?

25    A.   Yes, sir.
```

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1  Q.   That he made a mistake, he spread too much gasoline, and

2  apparently wasn't aware of it as the vapor, not the liquid that

3  ignites; isn't that right?

4  A.   I don't know if he mentioned too much gasoline, but I know

5  he mentioned the fact they had shut the door behind him and

6  allowed the vapor to pool in the office.

7  Q.   And in fact, it is the vapor that burns, not the liquid;

8  isn't that right?

9  A.   It's the vapor that explodes.

10  Q.   And that's often why people who do this end up causing

11  more damage than they think?

12  A.   Correct.

13  Q.   He was the one who spread the gasoline and lit it, right?

14  A.   I believe that's what he said.  Also he wasn't sure if Ms.

15  Mason had spread any or not.

16  Q.   The calls that were made by Ms. Mason to people in

17  Indiana, there was no content of those phone calls captured,

18  was there?

19  A.   No, sir.

20  Q.   Do you know that some of the people she was in contact

21  with were people she had known for years?

22  A.   I believe that is a fair assessment.

23  Q.   And because you've got none of the content, you don't know

24  what the subject of the calls back or emails back and forth was

25  other than the one that preceded her arrest; isn't that right?


KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1  A.   No, I don't.

2  Q.   Were you aware that some of those friends in Indiana were

3  assisting her in fund raising?

4  A.   No, I'm not.

5           MR. MINOCK:  If I could have just a moment, please?

6           THE COURT:  Yes, sir.

7           (Pause in proceedings.)

8           MR. FRANK:  Nothing further.  Thank you.

9           Judge, could we take a brief recess, please.

10          THE COURT:  Sure.  Let's see if Mr. Frank needs any

11 redirect.

12          MR. FRANK:  Your Honor, I did have a redirect.

13          THE COURT:  All right.  Go ahead.  Let's do that.

14          MR. FRANK:  It's not going--  It's something I

15 neglected to do on my initial direct.

16          THE COURT:  Go ahead.

17                    REDIRECT EXAMINATION

18 BY MR. FRANK:

19 Q.   Going back to this issue briefly of the relationship, and

20 you said already that the tenor of the conversations appeared

21 to be that Mr. Ambrose and Ms. Mason were pretty much equals?

22 A.   Yes.

23 Q.   Is there a specific conversation--  What did Ambrose tell

24 you about their relative roles as far as putting together the

25 idea to do MSU, to do the Agricultural Hall fire?

1   A.   In regards to recruitment?

2   Q.   Yes.  The recruitment, the planning, just in a nutshell.

3   A.   Basically Mr. Ambrose informed me that himself and Ms.

4   Mason had approached three other individuals in regards to

5   participating in the Michigan State arson.

6   Q.   Okay.  So he said they did it together, not that he led or

7   she led?

8   A.   Yes.

9   Q.   What did he tell you about their motivation-- or the

10  motivation for doing the arson the next day in Mesick, the

11  logging equipment?

12  A.   It was an attempt to have something on them, these three

13  individuals, who subsequently backed out of the MSU act,

14  therefore, that they wouldn't report them to the law

15  enforcement authority or agency.

16  Q.   Was there a consensual recorded-- well, a conversation

17  Mr. Ambrose recorded with Miss Mason about the Mesick fire?

18  A.   Yes.

19  Q.   And was sort of the pretext of that-- pretext on his part,

20  a discussion about who do we have to worry about turning us in?

21  A.   Yes.

22  Q.   Did he bring up this idea-- rather the assertion that they

23  had done Mesick in order to have something on the people that

24  backed out?

25  A.   Yes, I believe as Mr. Ambrose, as heard on the tape, he

1   basically said I thought we did this to have something on them

2   so that you know.

3   Q.   Ms. Mason's response, the tape recording doesn't pick up

4   the very first couple words of it, does it?

5   A.   Either words or syllables, they were unintelligible,

6   followed by a response saying it was either they thought or

7   felt it was very clear, something to that effect.

8   Q.   From the tone of the garbled language and the content of

9   the clear language, did it appear in any way, shape or form,

10  she was disagreeing with the assertion that they had both

11  thought up the Mesick idea and gotten the others involved?

12  A.   No, sir.

13  Q.   And what did he tell you about where they got the

14  information about the research that was being done at MSU?

15  A.   The information or regarding the selection of Miss Ives or

16  Dr. Ives as the target was acquired from a friend of Miss

17  Mason's, an individual named--

18  Q.   We don't have to go into the name, but it was a friend of

19  Miss Mason's who got them the information about MSU?

20  A.   Yes.

21  Q.   Was there a consensual recorded conversation between

22  Mr. Ambrose and Miss Mason about that person?

23  A.   Yes, I believe it was the same one you just mentioned, it

24  was just a few seconds later.

25  Q.   And in it, again, it wasn't a really clear recording, but

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1   can Ms. Mason be heard agreeing yes, Ertha got them the

2   information?

3   A.   Yes.

4            MR. FRANK:  Nothing else, your Honor.  Thank you.

5            THE COURT:  Mr. Minock.

6                      RECROSS EXAMINATION

7   BY MR. FRANK:

8   Q.   Mr. Shearer, do you have a copy of the transcript of the

9   conversation that you have just referred to with you up there?

10  A.   No, I don't.

11           (Pause in proceedings.)

12           MR. MINOCK:  If I may approach.

13           THE COURT:  Yes, sir.

14  BY MINOCK:

15  Q.   Actually, Mr. Shearer, I misspoke.  There is not a

16  transcript of the conversation to which you just referred, is

17  there, about Mesick?

18  A.   About Mesick, no.

19  Q.   What, that conversation was January 25th, '08, right?

20  A.   I believe so.

21  Q.   And significant portion of that recording, including the

22  parts of the conversation to which you've just testified, is

23  unintelligible, is it not?

24  A.   Not necessarily that recording, no, I'm not sure if you're

25  referring to the right recording.


                KATHLEEN S. THOMAS, U.S. District Court Reporter
             410 West Michigan Avenue, Kalamazoo, Michigan  49007
                           (269)385-3050

1  Q.   I'm referring to the one from January 25th?

2  A.   From what I understand, yes, portions of it are

3  unintelligible.

4  Q.   Including the part of the conversation that was the

5  subject you just testified about?

6  A.   Portions.

7  Q.   Yes?

8  A.   Which I testified to, yes.

9  Q.   Okay.  Now, I've handed you a transcript, just so you can

10  refresh your recollection, and at page-- and if I could refer

11  you to Page 9.

12  A.   Yes, sir.

13  Q.   Mr. Ambrose was talking to Ms. Mason trying to take her

14  through things, offenses they had committed together, right?

15  A.   Correct.  Some that he did and didn't.

16  Q.   And he posed to Miss Mason that three other people,

17  including the two co-defendants in this case, knew about

18  planning of the Michigan State incident; isn't that right?

19  A.   Could you rephrase that?

20  Q.   Yes.

21       Mr. Ambrose said that the others knew about the

22  planning of Michigan State, right?

23  A.   That was his recollection, yes.

24  Q.   And Ms. Mason disagreed with him, didn't she?

25  A.   That was her recollection, yes.


                KATHLEEN S. THOMAS, U.S. District Court Reporter
            410 West Michigan Avenue, Kalamazoo, Michigan  49007
                            (269)385-3050

1  Q.   At that point, she was not aware she was being recorded?

2  A.   No.

3            MR. FRANK:  If I could have just a moment.

4            THE COURT:  Certainly.

5            (Pause in proceedings.)

6            MR. FRANK:  Thank you.

7            THE COURT:  All right.  Counsel, do you want your

8  break?

9            MR. FRANK:  Please.

10           THE COURT:  Five minutes.

11           MR. FRANK:  Thanks.

12           THE COURT:  Thank you.

13           COURT CLERK:  All rise, please.

14           THE COURT:  Agent, you may step down.

15           COURT CLERK:  Court is in recess.

16           (At 10:34 a.m., recess.)

17           (At 10:40 a.m., proceedings continued.)

18           THE COURT:  We are back on the record in 08-47;

19  United States of America vs. Marie Mason.

20           Mr. Frank.

21           MR. FRANK:  Thank you, your Honor.

22           Your Honor, present in the audience is Dr. Ian Gray,

23  he is the vice president of research and graduate studies from

24  Michigan State University, and we invited him on behalf of the

25  university to make a victim impact statement.


              KATHLEEN S. THOMAS, U.S. District Court Reporter
          410 West Michigan Avenue, Kalamazoo, Michigan  49007
                          (269)385-3050

file:///A|/020509MM.txt

47

1               THE COURT:  All right.  Before we get to that, you

2     have no further witnesses?

3               MR. FRANK:  That is correct, your Honor.

4               THE COURT:  Mr. Minock, do you have any proofs to

5     present, sir?

6               MR. MINOCK:  Nothing other than what has already been

7     submitted.

8               THE COURT:  All right.  Thank you.  All right, now,

9     Mr. Frank.

10              Doctor, if you wish to come forward, and you may

11    stand at the podium, sir.

12              Good morning.

13              DR. GRAY:  Good morning.

14              THE COURT:  And could you just state and spell your

15    last name for the record, please.

16              DR. GRAY:  My name is Ian Gray, I-a-n, G-r-a-y, vice

17    president for research and graduate studies of Michigan State

18    University.

19              THE COURT:  You may proceed as you wish, sir.

20              DR. GRAY:  Thank you, your Honor.

21              I would like to make a few remarks on behalf of

22    Michigan State University.  Now, as my responsibility as vice

23    president for research is to oversee the research programs of

24    the university.  Before I assumed that position, I was a

25    director of the Michigan agricultural experiment station a

1   responsible for the agricultural research programs also of the

2   university.  And I've been a faculty member for 30 years, so I

3   would like to approach my comments from both administration and

4   as a faculty member.

5           Simply put, the perspective of the university is the

6   actions on New Year's Eve, 1999, were more than an attack on a

7   building and the destruction of valuable property.  This was an

8   assault on the core values of free and open inquiry at a

9   research institution.  We must always be open to ideas that

10  challenge our own, but we must never allow disruption designed

11  to shut down or derail the open marketplace of ideas.

12          Michigan State University was created over 150 years

13  ago.  And its basic components was support of the agricultural

14  commodities in the State of Michigan.  As such, we have gained

15  international reputation in plant sciences.  Part of our land

16  grant mission is to create a vision for international

17  agriculture.  And the Michigan-- MSU institute for

18  international agriculture runs a series of programs including

19  the agriculture biotechnology support program to help alleviate

20  world hunger through plant production.  That was the basis of

21  ABSP, which was a federally supported research program

22  consisting of several public and private universities in

23  conjunction with research efforts of the institutions in the

24  developing nations, to put together programs that will lead to

25  plant development that can survive stresses such as

1    environmental stresses, insects stresses, and disease

2    stresses.  Simply put, this ABSP was a program designed to

3    alleviate world hunger through plant bio-technology.  It was

4    the program, and I think very importantly, it was the support

5    program, support for the development of research activities to

6    allow developing nations and the universities associated with

7    those nations to be self sufficient in terms of research.

8              Now, to fully appreciate the impact of arson at

9    Michigan State University Agricultural Hall, some context is

10   required.  Only seven years earlier, arsonists attacked the

11   offices of two faculty members in Anthony Hall, which is the

12   department of animal science, and vandalized campus mink farm

13   facilities.  The enduring harm of this attack entailed the

14   destruction by fire of decades of research by a professor whose

15   scholarly attention ironically was devoted to developing

16   alternatives to the use of animals in research testing

17   methodologies.  And as we heard earlier, the Animal Liberation

18   Front claimed responsibility for this attack.  And so

19   obviously, the university when following the New Year's Eve

20   attack in 1999, when the administrative office of ABPS was

21   destroyed, they were very very sensitive to a second attack on

22   campus.

23             So if I was looking and reviewing the short and

24   mid-term impacts of the arson on that evening, first of all,

25   the immediate disruption of the ABSP program, including loses

1   of files and data, that was very very hard to reacquire those

2   data.  The necessity to relocate ABSP administrators to other

3   parts of campus, again, contributing to the discontinuity of

4   the program.  There was also loss of personal files and records

5   of faculty and offices adjacent to the ABSP offices due to the

6   effects of smoke, fire and water.  And of course the direct

7   repair of Agriculture Hall estimated to be about $1.1 million.

8           Longer term effects would include, to this day, the

9   ABSP staff still feel the psychic after effects of having been

10  burned out of their offices.  The director of ABSP no longer

11  works at the university, and she chose to change her career

12  path.  She is no longer employed by the university, and her

13  loss, coupled to that of her husband who also hailed a very

14  very important position at Michigan State University, left a

15  major void in our agricultural biotechnology programs.  And it

16  was the loss of personal property and the ignominious aspects

17  of intrusion were perhaps the greatest indignities she endured

18  through the arson crime.

19          Other parts of the university were also affected.  It

20  required a greater emphasis on security on our laboratories.

21  Apprehension within our plant science community was very very

22  palpable, and this was because at that time, in 1999, we were

23  getting to the stage of personal websites for our faculty,

24  because part of the university's reputation as a research

25  extensive institution was to bring notoriety to the research

1   programs, both nationally and internationally, of our faculty.

2   This was very key for the attraction of high quality graduate

3   students to the institution and to the attraction of future

4   faculty colleagues to identify future colleagues at the host

5   institution.  And so that may, it's hard to prove, we don't

6   have definite evidence, but there probably had a negative

7   impact on the recruiting of graduate students and faculty and

8   post-doctoral research associates.

9           I will conclude by saying something from the faculty

10   perspective:  Nothing is more precious to a faculty member than

11   academic freedom.  To a researcher, that means undertaking

12   scholarly activities that may or may not meet with the approval

13   of everyone.  Research can be controversial.  But the campus is

14   an open place for dialogue, and it's very very important that

15   that environment is maintained to enable thousands and

16   thousands of young scholars and professionals to come to campus

17   and work in an environment that is risk free.  Young folks like

18   to work on a laudable mission.  ABSP had a laudable mission.

19           A great research university like Michigan State

20   University must have a balanced research portfolio, and that

21   means engaging in all aspects of scientific inquiry.  Thus,

22   when people come to MSU's open campus, under the cover of

23   darkness, and to destroy and to put untold numbers of people at

24   risk, the resulting harm is inflicted on the entire academic

25   community, the academic freedom as faculty, the safety and

1   security of our employees and our graduate students, and to the

2   overall mission of an institution of higher education.  The

3   affront is profound in nature, and the impact is truly severe.

4           Thank you.

5           THE COURT:  Thank you, Doctor.

6           Mr. Frank, any other victims who wish to allocute,

7   sir?

8           MR. FRANK:  No, sir.

9           THE COURT:  All right.  Thank you.

10          All right.  We will-- I'll take argument on guideline

11  application issues.

12          Mr. Minock, do you wish to go first, sir?

13          MR. MINOCK:  Yes, I think probably the principal one

14  which affects the scoring is the assessment of points for

15  leadership.

16          THE COURT:  For leadership?

17          MR. MINOCK:  Yes.  The presentence report in multiple

18  paragraphs, as the amended report notes, refers to leadership,

19  and I think there is two aspects to it.  The points that are

20  assessed on the theory that Ms. Mason supervised others, at

21  page-- Paragraph 69, supervised others in the destruction of

22  logging equipment in Mesick, the day after the Michigan State

23  incident.  I object to that.  There is no proof in the record

24  that Ms. Mason supervised or directed the others.  She did not

25  say that in her interview with the probation department, and

1    there is nothing in the record to that effect one way or the

2    other.  Mr. Frank (sic.) was assessed three points I don't know

3    what he said about that in his interview.

4              THE COURT:  You mean Mr. Ambrose?

5              MR. MINOCK:  Mr. Ambrose, I'm sorry.

6              Mr. Ambrose.  And his attorney did not object to

7    those three points, but I do.  There was nothing in the record

8    with regard to Ms. Mason to justify that imposition.

9              THE COURT:  Thank you, sir.

10             Mr. Frank.

11             MR. FRANK:  Yes, your Honor.  Well, we have had the

12   testimony of Agent Shearer regarding the statements that

13   Mr. Ambrose made directly.  We don't have any evidence of

14   record right now contrary to that.  We have Ms. Mason's history

15   as a co-equal, as an extremely involved in this movement-- in

16   this-- these movements to include illegal activity.

17             Also, we have recordings of Agent Shearer testified

18   to about where they were talking about how on MSU, which

19   happened the day before Mesick, and it's not like you can

20   logically separate those two.  MSU, the information came from a

21   friend of Ms. Mason's.  They pitched or tried to recruit the

22   other people to come to campus with them, they did it together,

23   so that logically suggests, pretty strongly suggests, that the

24   next day again they were calling the shots, they were acting in

25   concert, in the eyes of these other three people, two of whom

1    were-- whose involvement was minimal, Miss Fultz and

2    Mr. Burthwick, the idea that they somehow, on this one

3    occasion, were not being led, just is not well supported by the

4    record.  So we think that clearly the evidence is there, that

5    it was their-- we are not saying Ms. Mason was calling the

6    shots, but Mr. Ambrose and Miss Mason together.  MSU was their

7    idea, their baby, their plan and their execution, and it makes

8    sense that since the other three backed out that they would

9    want to have something hanging over the heads of those other

10   three, and that is consistent with what Mr. Ambrose's account

11   was.  So we think the evidence in the record established by a

12   preponderance that leadership is appropriate.

13           Thank you.

14           THE COURT:  All right.  This particular issue

15   surrounds the enhancement pursuant to 3B1.1.  The presentence

16   officer has assigned a three-level increase to the guidelines

17   for this particular guideline.

18           The guideline reads as follows: "If the defendant was

19   a manager or supervisor, but not an organizer or leader, and

20   the criminal activity involved five or more participants or was

21   otherwise extensive, increase by three levels."

22           There doesn't appear to be any argument that there

23   were five or more participants in this activity.  Indeed, the

24   record is perfectly clear that in addition to Ms. Mason and

25   Mr. Ambrose, Ms. Fultz and Mr. Burthwick and one other

1    individual were involved in this enterprise.

2         It's also important to also note that the presentence

3    officer had the option to score four levels for organizer or

4    leader, which he did not do.  Indeed, he scored at three

5    levels, and the question becomes whether there is factual

6    evidence in the record to support that guideline enhancement

7    for role.

8         I also want to state for the record that I have

9    considered the sentencing memorandums of both the government

10   and the defendant.  The defendant submitted their documents in

11   two parts.  I also have two sealed submissions from the

12   parties, one from the defendant and one from the government,

13   and I have considered those-- all of those materials in any

14   ruling that I make this morning.

15        In essence, the defendant asserts that Ms. Mason

16   should not be a scored as a supervisor in this case, because

17   apparently from the defense perspective, Mr. Ambrose was the

18   leader of this enterprise.

19        I would note several things for the record here:

20   First, it's contained in the presentence report that Ms. Fultz

21   stated-- Ms. Fultz being a very minor player in this crime--

22   states that it was her impression that Ms. Mason was in

23   charge.  In addition to that, the essence of the defendant's

24   argument, if I understand, it was that she was under a certain

25   amount of pressure or was dependent vis-a-vis Mr. Ambrose and

1    therefore should not be scored as a supervisor.  The totality

2    of the record here says otherwise in the Court's judgment.

3    Based on the admitted conduct of Ms. Mason, there are three

4    crimes prior to December 31, 1999, there are six after.  The

5    Court is also mindful that based on the testimony of Agent

6    Shearer this morning that Ms. Mason's friend, un-named as far

7    as the Court is aware, but Ms. Mason's friend, obtained the

8    information about Dr. Ives, who was conducting the research

9    that was the-- at the site of the Agricultural Hall fire at

10   Michigan State on December 31, 1999.

11        I am not persuaded by the psychological evaluation

12   that the defendant has submitted under seal, that Ms. Mason was

13   a dependent personality here in relationship to this criminal

14   activity, which she has admitted, pursuant to the plea

15   agreement.  I also recognize, based on the letters I have

16   received, that many of Ms. Mason's friends, her family, have

17   visions and impressions of Ms. Mason that would tend to support

18   the evaluation made which has been submitted under seal.  I

19   wonder, however, what their impression would be if they were

20   present at the Agricultural Hall on December 31, 1999, when the

21   research facility went up in flames, which has been the subject

22   matter of this presentation this morning.

23        The Court finds as a matter of fact that Ms. Mason

24   and Mr. Ambrose were co-supervisors of this enterprise.  I am

25   satisfied from the totality of the record contained both in


KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1   Agent Shearer's testimony, as well as the contents of the

2   materials that have been submitted to me, that she and

3   Mr. Ambrose were willing co-conspirators, that they had equal

4   participation in these crimes.  Accordingly, the objection to

5   the three-level enhancement for role is overruled.

6            Mr. Minock, do you wish to address the terrorism

7   enhancement, sir, or do you want to stand on your papers?

8            MR. MINOCK:  Well--

9            THE COURT:  Whichever you like, sir, whichever.

10           MR. MINOCK:  You are talking about application of the

11   enhancement?

12           THE COURT:  Correct.  Or the second part of your

13   argument, as I understand it, is that the twelve levels may not

14   be appropriate even if it should be applied.

15           MR. MINOCK:  I could go into all of that now.  Do you

16   want to hear everything on the terrorism enhancement at this

17   point?

18           THE COURT:  Well, what I would like to do is I would

19   like to get the-- let's get the application issues out of the

20   way.  And that would be the application of the twelve levels

21   pursuant to the guideline, recognizing that the Court has

22   discretion to vary from the application of the guidelines, but

23   let's talk about the application issue.  Do you contest the

24   application of the twelve levels for purposes of formulating

25   the advisory guideline range for the Court?

                 KATHLEEN S. THOMAS, U.S. District Court Reporter
              410 West Michigan Avenue, Kalamazoo, Michigan  49007
                            (269)385-3050

```
 1              MR. MINOCK:  Yes, I do, and the fact that it moves
 2   her from the lowest criminal history category to the highest as
 3   well.  Yes, I object to the application of the enhancement
 4   here.
 5              THE COURT:  All right.  Thank you.  And you stand on
 6   your submissions.
 7              MR. MINOCK:  That is correct.
 8              THE COURT:  Mr. Frank, do you wish to address that
 9   issue?
10              MR. FRANK:  Principally, we will rely on the
11   government's sentencing memorandum, your Honor, but we will
12   point out that stipulated to in the plea agreement these
13   offenses involved federal crimes of terrorism.  According to
14   the statute by definition, that definition leads to 3A1.4, the
15   enhancement, and there is plenty of precedent where the
16   enhancement has been applied to domestic terrorism offenses.
17   We think that as a matter of technical application of the
18   guidelines, there is no question but that 3A1.4 does apply
19   apart from the question of whether some departure or variance
20   from that is warranted.
21              THE COURT:  All right.  Thank you.
22              This issue involves the application of the terrorism
23   enhancement guideline, which is 3A1.4.  That reads as follows:
24   "If the offense is a felony that involved or was intended to
25   promote a federal crime of terrorism, increase by twelve
```

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    levels, but if the resulting offense level is less than 32,

2    increase to Level 32."  Part B reads:  "In each such case, the

3    defendant's criminal history category from Chapter 4 shall be

4    Category VI."

5         The defendant has raised two issues in regard to

6    the-- for now, raising two issues as it relates to the

7    application of the twelve-level enhancement and the movement of

8    the defendant's criminal history category from what otherwise

9    would be I to Criminal History Category VI.

10        First, the Court notes for the record, Paragraph 25

11   of the plea agreement in this case in which the defendant makes

12   admissions of her conduct, which in the Court's judgment,

13   require the application of the guideline.  The defendant's plea

14   included an admission that the crimes that she pled to

15   "involved or were intended to promote a federal crime of

16   terrorism as that term is defined in 18 U.S.C. 2332(b)(G)(5).

17   The plea also states the defendant was motivated to intimidate,

18   coerce and deter government agencies among others from

19   supporting the research-- this sort of research.  That's

20   Paragraph 5F.  In addition to that, in the Court's judgment,

21   the PSR and the information include sufficient factual

22   allegations to support the application of the terrorism

23   enhancement.  The Court also wants to state for the record that

24   I many mindful of the Salim, S-a-l-i-m, case, 549 F.3d, Page

25   67, a Second Circuit 2008 case, which makes it perfectly clear

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    that domestic terrorism can be a subject matter of the

2    application of this guideline.  Likewise the Garey case,

3    G-a-r-e-y, 546 F.3d, 1359, an Eleventh Circuit case, and Parr,

4    P-a-r-r, 545 F.3d 491, a Seventh Circuit, 2008 case.

5    Accordingly, the objection to application of 3A1.4(a) is

6    overruled.

7            As it relates 3A1.4, this moves Ms. Mason from

8    Criminal History Category I to Criminal History Category VI,

9    and the defendant's argument among others, as I understand it,

10   is that this overstates her criminal history score and

11   implicates the application of 4A1.3, which is the Court's power

12   to depart if the criminal history score as calculated by the

13   guidelines overstate the defendant's criminal history.

14           Indeed, in terms of scorable offenses, Ms. Mason

15   scores out at Criminal History Category I.  But the Court is

16   also mindful of her admissions contained in her plea agreement

17   concerning what can only be described as a very extensive list

18   of felony crimes, whether they be at the state or federal level

19   over the course of a number of years.

20           For those reasons, given her admissions that she

21   committed those felonies and all of those crimes which she

22   admits to would constitute felonies either under state law of

23   Michigan or the State of Indiana, the Court does not believe

24   that Ms. Mason is improperly scored at Criminal History

25   Category VI.  Accordingly, the objection to the application of

1    3A1.4(b) is overruled.

2            I also want to state for the record that I am fully

3    mindful of the discretion given me by the United States Supreme

4    Court in the decisions of Kimbrough, Rita and Gall.  I have

5    read them extensively multiple numbers of times.  This Court

6    has had one of its cases remanded on a sentencing that the

7    Court did pursuant to the Kimbrough decision, in which I

8    sentenced an individual one month before Kimbrough was decided

9    by the United States Supreme Court, but I am fully mindful of

10   my discretion as it relates to those cases.  And also the

11   Spears case and the Nelson case, which are very recent Michigan

12   Supreme Court decisions related to Kimbrough, Rita and Gall.

13           All right.  Thank you.

14           Mr. Minock, any other guideline application issues,

15   sir?  I think we have covered them.  You do have some

16   objections to Paragraphs 39, 41, 48 and 42, would you like me

17   to resolve those?  I read in your memorandum that you wanted me

18   to resolve those.

19           MR. MINOCK:  Yes, please.

20           THE COURT:  All right.  Thank you.

21           I'll do so.

22           Mr. Frank, do you want to weigh in on any of that?

23           MR. FRANK:  Your Honor, if you could help me out,

24   those are the ones just objecting to the resolution of the PSR

25   writer concerning the relative accounts of Mr. Ambrose?

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1            THE COURT:  Correct.

2            MR. FRANK:  We think based on the evidentiary hearing

3    and also on the Court's ruling on the enhancement that we are

4    satisfied on that score, we don't need to address them any

5    further.

6            THE COURT:  Thank you.

7            As far as Paragraph 42 is concerned, the Court has

8    sustained the objection-- I'm sorry, overruled the objection as

9    it relates to role.  The Court has found as a matter of fact

10   that Mr. Ambrose and Ms. Mason were co-participants and had

11   equal culpability.

12           Paragraph 48, the source of that information is the

13   defendant herself, and I have for the purposes of the record, I

14   have conferred with Mr. Dingwall who is the PSI writer in this

15   case and his notes confirm the factual material that is

16   contained in Paragraph 48.

17           As far as Paragraph 41 is concerned, in the Court's

18   judgment, that paragraph is accurate.  And Paragraph 39, that

19   material contained in that paragraph will not affect the

20   Court's sentence in any way.

21           All right, Mr. Minock, anything further on guideline

22   application?

23           MR. MINOCK:  No, thank you.

24           THE COURT:  All right.  Mr. Frank, do you have any

25   guideline application issues?


                KATHLEEN S. THOMAS, U.S. District Court Reporter
             410 West Michigan Avenue, Kalamazoo, Michigan  49007
                            (269)385-3050

1            MR. FRANK:  No, your Honor.

2            THE COURT:  All right.  Thank you.

3            I think we are ready for allocution.

4            Mr. Frank.

5            MR. FRANK:  Thank you, your Honor.  Could I approach

6    the podium?

7            THE COURT:  Yes.

8            MR. FRANK:  Your Honor, in the defendant's sentencing

9    memorandum defendant asserts that she has renounced violence

10   and realizes the error her ways.  If that's happened, it's only

11   happened very recently.  I think today's evidentiary hearing

12   demonstrates that.  While she was on bond, she gave us some--

13   the Court some insight, perhaps unintentionally, about what was

14   still going on in her mind.  This is relevant of course to the

15   issue of specific deterrence, further dangerousness,

16   rehabilitation, all of those things that are proper

17   considerations in imposing sentence.  She gave the Court some

18   insight into what was still going on in her mind while she was

19   on bond.  In "My Green Scare Arrest" she encourages-- she sees

20   things-- this is how she views it, as a strong community of

21   resistance, "We can withstand the repression of the state and

22   continue to fight for the earth."  That is what this is, the

23   repression of the state.  Prosecuting people like her is state

24   repression.  It's not law enforcement.  It's state repression.

25   "Stay strong, I'm with you in spirit.  My time may be done,

1    but yours is just beginning." From someone facing a felony

2    prosecution for extremely violent crime, that doesn't reflect a

3    lot of remorse. Neither do her My Space postings. In short,

4    "My organizing and carousing career is about to take a sharp

5    turn." Carousing, that's what that fire was carousing, your

6    Honor, carousing. Those fire fighters were dealing with the

7    consequences of Marie Mason's carousing. Perhaps the same kind

8    of carousing that her hero, Rod Coronado, was doing when he

9    burned a building at MSU a few years earlier. If she's come to

10   the realization of the wrongness of her acts or the

11   appropriateness of remorse, it's only happened extremely-- very

12   recently.

13          There's also evidence of continued commitment to

14   cause, continued contact with people doing the same sort of

15   thing. Now, the evidence we presented about this contact with

16   I-69 Now, the I-69 people Now, or with Rod Coronado back in

17   2003 and David Agranoff, obviously it's not meant to-- it can't

18   prove she was directly involved in those acts, but it proves

19   continued contact with people who think that kind of protest is

20   acceptable. Specifically giving an, even on minor things like

21   this tree sit business. In February, before she was arrested,

22   she's talking about giving training in rappelling and tree

23   climbing and stuff, and the next thing you know while she's on

24   bond there is a tree sit, and coincidentally, that same day

25   she's talking to people who are suspects-- who were charged for

1    that kind of activity, even though she had been told not to.

2    So this continuing-- again, if she's come to a realization of

3    the wrongness of her means, which is completely separate from

4    the rightness-- possible rightness of an objective, but the

5    wrongness of the means, if she's come to that realization, it's

6    only happened sometime since last summer.

7              Moreover, even if she has renounced violence as a

8    means of obtaining some objective, she hasn't accepted the

9    lawful authority of law enforcement or the lawful authority of

10   this Court, as the sealed memorandum demonstrates.  We think

11   it's clear, at least by a preponderance, that if she had chosen

12   to answer questions, she could have been extremely helpful to

13   law enforcement.  And it was one thing when she had the legal

14   right to refuse to answer those questions, perfectly

15   legitimate, everybody in our system accepts that.  But at the

16   time she refused, the last time she refused to answer those

17   questions, she had absolutely no legal right or justification

18   to do that, and she refused to answer the questions.  So even

19   if she feels remorse, that is not the same thing as respect for

20   the authority of the engines of a lawful society, the origins

21   of a lawful society.

22             We think there is an extremely strong need for a

23   sentence here that will impose-- that will provide specific

24   deterrence.  We think there is also strong need for general

25   deterrence.  People have to realize that whatever their cause

```
 1    is, if they pursue that cause in the way that Ms. Mason did,

 2    there is going to be a steep price to pay.  It may happen soon

 3    after a crime, it may take a decade, but odds are, it's going

 4    to happen.  And especially young people, impressionable people

 5    need to understand what they might do now, maybe they wouldn't

 6    get caught now, but ten years down the road it could come back

 7    and it could absolutely alter the course of their lives.  That

 8    this is serious business.  We ask for-- we think the Court

 9    really needs to fashion a sentence here in terms of general

10    deterrence that will make clear that this is serious business.

11    It is not a game.  And that if people feel strongly about

12    something, then there are any number of ways, legal protests,

13    litigation, political act, any number of ways to do that within

14    the bounds of the law.  But the way Ms. Mason chose is not the

15    way to go.

16          Seriousness of the offense, your Honor, of the crimes

17    here.  Obviously they are all stipulated acts and the Court

18    already noted them, so I'm not going to beat the record to

19    death, but we would like to focus a little bit on the

20    seriousness of the specific offense here, that is, the MSU

21    arson.

22          You heard, I think very eloquently, from Dr. Gray

23    about the effects it had on MSU.  I mean an open institution

24    where researchers and professors and kids are not supposed to

25    have to worry about this kind of stuff.  Their parents don't
```

1    send them to MSU thinking there is going to be an explosion

2    with a multi-hundred pound window flying through the dark

3    landing on a sidewalk that might squash their child.  That's

4    not why people send children to universities, certainly not to

5    one of the stature of MSU.

6           Seriousness of the offense.  You heard from Dr. Gray

7    about that.  There is also the money loss, which really sort of

8    pales in comparison to the physical danger of that fire.  Those

9    firemen groping around in the dark and smoke, with fire beneath

10   them and fire above them trying to find the source of the

11   fire.  We think what the Court saw pretty much speaks for

12   itself in terms of the dangerousness.  And also the window,

13   it's pure luck that when that explosion happened sometime early

14   in the evening New Year's Eve, pure luck that there wasn't

15   someone down at the bike rack or walking down the sidewalk.

16   And it's also pure luck Marie Mason and Frank Ambrose didn't

17   die in that fire, that's something to consider.  They could

18   have easily killed themselves in that fire.  But

19   notwithstanding the seriousness of that offense, did that deter

20   Ms. Mason?  Not one bit.  She celebrated it.  Her community

21   celebrated it.  It was an iconic, original and effective

22   action.  It extended the reach of ELF.  Far from remorse, she

23   celebrated it and continued in a course of conduct doing

24   exactly the same kind of thing, more fires.  Fortunately, none

25   that were as dangerous as the MSU fire, but more fires.


                 KATHLEEN S. THOMAS, U.S. District Court Reporter
              410 West Michigan Avenue, Kalamazoo, Michigan  49007
                              (269)385-3050

1          Now, the defense brings up the issue disparity and

2     draws or invites the Court's attention to these sentences from

3     the District of Oregon.  I'm not going to stand here and tell

4     you that's not relevant, of course it's relevant, and the Court

5     has already indicated it will give full consideration to that.

6     But the fact of the matter is, it's not just the District of

7     Oregon and those sentences out there, it's also the Eastern

8     District of California, if we are going to go down that road of

9     comparing different district results.  Eric McDavid got 19

10    years seven months, and never actually did physical damage.  So

11    I cite the McDavid case only to point out the utility or

12    usefulness of looking to what other courts have done in a

13    handful of cases or what other U.S. Attorney's Offices have

14    done in a handful of cases, that the utility of going down that

15    road is perhaps limited.  It also begs the question of why this

16    Court should feel bound to follow the District of Oregon any

17    more than this U.S. Attorney's Office should be bound to follow

18    what the U.S. Attorney in the District of Oregon did.

19         The fact of the matter is, your Honor, white collar

20    sentences in the Western District of Michigan probably draw

21    stiffer sentences than they do in Northern Illinois or Southern

22    New York.  Drug cases in the Western District of Michigan

23    probably draw stiffer sentences than they do in Southern

24    Florida.  Immigration cases in District of Arizona and Southern

25    Texas and Southern California probably don't draw the same

1    sentences they do in Western Michigan.  I'm willing to bet the

2    District of Guam has got a typhoon plan, but the Western

3    District of Michigan doesn't, and the District of Guam doesn't

4    have a blizzard plan either.  It's a big country, a lot of

5    different districts.

6           And more to the point, these defendants-- now, the

7    defense does give the Court some information about these people

8    beyond just the charges and what they were sentenced to, but

9    the fact of the matter is, that is an entirely different judge

10   in another district exercising his or her discretion based on

11   presentence reports that probably go on for pages, dozen or two

12   dozen pages just like the ones in this case do.  So the utility

13   of looking at those other districts, we think, the usefulness

14   of that is limited.

15          This Court is going to sentence this defendant based

16   on the facts of this case, and applying all the factors with

17   the guidelines as start point, impose a sentence that is

18   sufficient but not greater than necessary.

19          From the government's perspective, bottom line here

20   is that this was a grossly dangerous act, the MSU arson was,

21   followed by a campaign of similar acts by the defendant, and

22   she's proud of it.  At least through this past summer while she

23   was on bond, she remained proud of it, and she's celebrated for

24   it in her community.  She needs punishment.  People who think

25   that the way she did business is admirable need to see that


                    KATHLEEN S. THOMAS, U.S. District Court Reporter
                410 West Michigan Avenue, Kalamazoo, Michigan  49007
                              (269)385-3050

 1    punishment being imposed so maybe hopefully they won't go down

 2    that road, especially younger people, hopefully they won't go

 3    down that road.  And society, law abiding society needs to see

 4    an appropriate punishment, administered here in order to

 5    promote respect for the law, and to make clear again a good

 6    cause does not justify the worst means.  That is just not how

 7    it works.  This is a society where you don't have to go down

 8    that route, and anyone who thinks they do, is just plain

 9    wrong.  It's not how this society works.

10         Now, the government has recommended a sentence of 240

11    months, your Honor, which we know is significantly below the

12    advisory guideline range.  That is based on a number of

13    considerations but, of course, the government comes at this

14    from a different perspective than the Court does.

15         The government-- these recommendations as part

16    through a negotiating process, a bargaining process with the

17    defendant, what is it worth to this district, what was it worth

18    to the Eastern District of Michigan, Southern District of

19    Indiana, globally what is it worth to the affected districts to

20    have the guilty pleas, not to go through a trial, perhaps not

21    to have to compromise other ongoing investigative activities.

22    There is an element of market ethic, market motive that comes

23    into a negotiated government recommendation, and I realize that

24    is a different-- that the Court doesn't have that consideration

25    at all.  I'm just explaining to the Court why we are

1   recommending a sentence that is so far below the bottom of the

2   advisory guideline range.  Based upon all the facts and

3   circumstances of our investigation, past and present, it made

4   sense for the government to bind itself to not advocate for a

5   sentence in excess of 20 years, 240 months, and we are going to

6   stick by that even though arguably we might have grounds to not

7   to.  We are going to stick by that promise, and the government

8   is not advocating for a sentence in excess of 240 months.

9           And as Mr. Minock points out in his sentencing memo,

10  and we acknowledge in ours, if the Court decides in the

11  exercise of it's full discretion to impose that sentence, while

12  it would be ten years, 120 months below the guidelines, it

13  would still be the most onerous sentence imposed in a case of

14  this sort to date.  So based on all of those considerations and

15  purely from the government's law enforcement perspective, we

16  think a sentence of 240 months would be appropriate.

17          Thank you, your Honor.

18          THE COURT:  Thank you, Mr. Frank.

19          Mr. Minock.

20          MR. MINOCK:  Yes.

21          THE COURT:  You may proceed as you wish, sir.

22          MR. MINOCK:  The first thing I want to address is the

23  application of the terrorism enhancement, that is, whether you

24  should apply it fully or whether you should, as the government

25  has recommended, grant a downward departure variance, and the

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    question then is how far.

2           I note at the outset the plea agreement provides that

3    the government would recommend a sentence of 20 years and has

4    agreed it would not appeal any sentence that was at least 15

5    years.  Even 15 years would be harsher than has been imposed in

6    any comparable case in the country.

7           The-- I'll touch on the McDavid case in just a

8    moment, but the government noted that-- made an argument which

9    seemed to suggest that or if you will, to ignore the purposes

10   of the Sentencing Reform Act.  According to the sentencing---

11   this is a passage from my sentencing memo, and I want to tell

12   you its source, and namely, it was commission staff at an

13   advanced training put on by the United States Sentencing

14   Commission, and I quote:

15          "The purpose of the Sentencing Reform Act in the view

16   of the commission is to put all districts on the same footing,

17   that is, to eliminate disparities and achieve uniformity in

18   sentencing throughout the country."

19          I submit that while there are different-- will be

20   differences between districts, that there is not a principle

21   rationale here for a departure from other related cases to the

22   extent that the government is urging here.

23          The reason that I did not include the McDavid case in

24   the materials I provided to you was because the allegations in

25   that case are dramatically different.  In that case, if memory

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    serves, the government recommended 20 years.  Mr. McDavid was

2    convicted of taking part in a bomb plot, which didn't come to

3    fruition, but would have caused the loss of innocent lives.

4    And if I-- the government, I believe, requested 20 years in

5    that case, and the Court imposed a sentence of 19 and a half.

6    I'm advised by his attorney that while Mr. McDavid denied the

7    allegations that I questioned Agent Shearer about on the

8    witness stand, nonetheless, the government maintained in that

9    case, and the Court found, that Mr. McDavid intended to take

10   part in the bombing of a dam which would have flooded the City

11   of Sacramento, caused the loss of innocent life, and expressed

12   that he did not care if it had done that.  For that reason, I

13   don't think that case belongs in the same universe of cases.

14           There are about twenty cases roughly--  Let me back

15   up.  From sentencing commission data, it appears that the

16   terrorism enhancement has been applied in only about 60 cases

17   to date.  Most of those cases, if one reviews the reported

18   cases both at the circuit level and district level, reflect

19   that the underlying crimes contained either homicide or

20   deliberate intent to commit homicide.  The cases that I have

21   compiled in the chart that I've provided and referred to in

22   Part One of my sentencing memorandum, are the cases related to

23   this one, they arose out of the same investigation by the FBI,

24   and in all of those cases, the intent was clearly to the

25   contrary.  The intent was not to cause-- not to commit murder,

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    not to cause harm to any person, but to damage property.  One

2    might say well, gee, that's only twenty cases, that's a

3    relatively small universe.  Well, it's about-- the terrorism

4    enhancement has been applied so few times that twenty is about

5    a third of the cases in which it's been applied.  And in those

6    cases, other cases prior to this one, the government has

7    requested and courts, more than one court, has imposed

8    sentences which reflect dramatic downward departures from the

9    consequence of application of the terrorism enhancement,

10   departures of 12 to 17 levels.  In this case, the government is

11   recommending a departure of only six.  And I submit that that--

12   if you were to follow that, that it would be defeating the

13   purpose of the Sentencing Reform Act, that is, it would be

14   encouraging disparity.  And I think the reason that the

15   government has taken that position in the other cases is

16   obvious.  The terrorism enhancement is inflexible.  It puts a

17   person at least at Category 32 and Criminal History Category

18   VI, and there is no gradations between the degree of harm or

19   the kinds of harm that were caused.

20           THE COURT:  If I can interrupt you for just a moment,

21   counsel.

22           MR. MINOCK:  Certainly.

23           THE COURT:  The 12 or 17 cases you were referring to,

24   you gave me very detailed material from the District of Oregon,

25   which I appreciate, it's true is it not, that a vast majority

1    of those individuals also received 5K motions, is that a fair

2    statement?

3            MR. MINOCK:  That is true.  And also--

4            THE COURT:  Doesn't that impact the efficaciousness

5    of those cases as it applies to this one where there is no 5K?

6            MR. MINOCK:  The reason I don't think so is I spoke

7    to most of the defense lawyers in all of those cases, and the

8    truth of the matter is that the degree of cooperation there

9    varied greatly, and for most of those defendants, it did not

10   involve testimony, but only debriefing, and limited at that.

11   Four of those defendants entered pleas, as did Ms. Mason,

12   without agreeing to cooperate and without a 5K, and

13   nonetheless, the government still made 5K motions on those

14   defendants on the theory that they all came to the table at

15   once.

16           In addition, one of the defendants who was not in the

17   Oregon cases, but in the State of Washington, in federal court

18   in Washington, went to trial and was convicted of causing $6

19   million in harm at a fire at the University of Washington.

20   That defendant maintained her innocence, and the case is on

21   appeal.  In that case, the government, after trial, without

22   cooperation, without acceptance of responsibility, and with

23   damages in excess of that in this case, recommended ten years

24   and she was sentenced to six.

25           I think when you stop and analyze it, my point is

1    that there is simply not a basis for the degree of disparity

2    that the government urges here.  And I think with the twenty

3    year recommendation, they have overshot the mark, as a matter

4    of law.

5              THE COURT:  But it's unwarranted sentencing disparity

6    that is the evil to be attacked, correct?

7              MR. MINOCK:  That is correct.

8              THE COURT:  And when one says sentencing disparity,

9    the general notion is that like offenders should be treated in

10   a like manner.

11             MR. MINOCK:  That is correct.

12             THE COURT:  Given the distinction between what was

13   going on in the Oregon cases and this case, I'm having trouble

14   grasping how those should inform my analysis.

15             MR. MINOCK:  Well--

16             THE COURT:  And I'll add, the last case of this type

17   that the Court is aware of in this district dealt with the '93

18   fire at MSU, which is prior to the terrorism enhancement being

19   incorporated in the guidelines in 1997.  This is Mr. Coronado.

20             MR. MINOCK:  Yes.

21             THE COURT:  And my colleague, Judge Enslen, went to

22   the top end of the guidelines with Mr. Coronado.  So I have

23   Western District history that is certainly, of course, more

24   geographically relevant than the dynamics of a case out in

25   Oregon or Washington.  But so I've really given you two

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    questions there, so why don't you go ahead.

2          MR. MINOCK:  Well, first of all, I go back to what

3    the commission's position, and that is that all districts

4    should be on the same footing.  The purpose is to eliminate

5    disparity.

6          I think while some-- I think the west coast cases are

7    comparable.  Virtually all of those pleas-- the pleas in those

8    cases wrapped up other potential state and federal charges just

9    like this one did.  And I noted in the lengthy chart I appended

10   to my sentencing memo, to the extent that it could be

11   determined, the number of uncharged cases that were resolved by

12   the pleas, in that respect those cases are similar to this one,

13   I noted the government recommendations, which are all

14   substantially lower by half in virtually every case, I think,

15   but one exception than this case.  And that person, Stanislas

16   Meyerhoff, for whom the government recommended 15 years-- 15

17   and a half, 188 months, took part in 11 or more arsons, caused

18   damages in excess of $30 million, and traveled around the

19   country instructing other people how to do this.  Extensively.

20   So given that, I submit that the recommendation is unreasonably

21   disparate, and that you should consider the data from the other

22   cases in imposing the sentence here.  Where Ms. Mason, based

23   upon objective criteria would fit in comparison to these other

24   cases, would be somewhere in the middle, and a sentence-- a

25   non-disparate sentence would be less than ten years by

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    comparison.

2         Even granting that there is a-- are justifications

3    for some disparity between districts and between individual

4    cases, nonetheless, I note that Mr. Meyerhoff to whom I

5    referred-- whose conduct I think was far more extensive and far

6    more dangerous than that in this case, his actual sentence was

7    156 months, which is 13 and a half years, I believe.

8         I think I touched on it, but I want to re-emphasize,

9    of course, that I think you've got broader discretion in this

10   case than you might in a case where the guidelines were

11   empirically based.  As you know, the terrorism enhancement was

12   imposed as a consequence of Congressional directives, not

13   history and study, but I'm probably belaboring a point.  I'm

14   aware you did some work with the commission.

15        THE COURT:  Indeed.

16        MR. MINOCK:  That said, does the Court have any other

17   questions about the disparity issue?

18        THE COURT:  No, sir.

19        MR. MINOCK:  With all respect to Mr. Frank, I think

20   that he-- Ms. Mason is a woman who was a complex character and

21   has many, I think, internal contradictions.  And I think that

22   with all respect to Mr. Frank, the government misjudges her.

23   She does not have an ego stake in nor has done anything that

24   I'm aware of to boost the view that others have of her.  I

25   think in part some of the outpouring of sympathy for her that

1  was referred to is based upon the fact that she is a very

2  self-effacing and mild-mannered person.

3          The letters that you've seen, I'm not going to

4  reiterate them or quote from them, but I know that you've read

5  them.  The letters, for example, from her children reflect the

6  immense amount of time that she spent performing charitable

7  works on a totally volunteer basis, when she didn't have to do

8  it.  Helping feed the homeless, and not at a time when she was

9  looking for a brake from a court at sentencing, but just as a

10  part of her life, as a part of who she is.

11          And I think perhaps the government's misjudgment of

12  her spills over into other things.  Miss Mason pointed out to

13  me that the reference the government made to something that was

14  posted by her on the internet about the end of carousing.  The

15  government thought that reflected how she characterized her

16  offense behavior.  That wasn't the point.  At the end of that

17  passage, she makes a reference to other people who go ahead and

18  tip a shot of Jamieson's.  Carousing that she was referring to

19  was drinking and dancing, and that is what she-- that's what

20  she was referring to would be coming to an end for her.  At the

21  time that she said that, she was fully aware that she was

22  facing a prison sentence, not knowing what the length of it

23  would be.  But that's what the reference is.  And I say this

24  not to-- not to be confrontational with Mr. Frank, but I

25  believe that the government's view of her, I think, has a-- has

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    resulted in a tendency to take some things out of context, and

2    that is perhaps just a small example.

3           I and Ms. Mason's former sister-in-law, who wrote one

4    of the letters to you, who is a licensed private investigator

5    and has worked with me on the case, she and I have been witness

6    to an evolution in Ms. Mason's thinking and the way that she

7    views this in her point of view about the case.  And that

8    evolution, I am convinced, is sincere and is not result

9    oriented, not a result of coming before you today.  When she

10   was interviewed the second time by the probation officer, her

11   expression of remorse and her acceptance of responsibility

12   was-- this struck me at the time, and I even told her about it

13   after the interview, that it was the most insightful and the

14   most empathic I have ever seen in any client in hundreds if not

15   thousands of clients over a 34-year career.

16          My-- I strongly believe that to the extent her

17   expression of regret and remorse to characterize-- to

18   paraphrase what the government said, represents a change in her

19   thinking to the extent there has been an evolution, and I am

20   convinced it is honest, it is not result oriented, it is not

21   jesuitical.

22          The question arises what in the world led her to do

23   these sorts of things?  And I think one part of the answer, and

24   I think it's the major part of it, is very clear.  There was a

25   very bad synergy between Ms. Mason and Mr. Ambrose.  She didn't

1    engage in this kind of conduct before she met him, and as far

2    as I know, neither did he.  And the two of them went on

3    something of a spree for several years.  After they split up,

4    neither of them engaged in it again either.  And I think what

5    happened is, and this is something others who we have

6    interviewed have said, is that they fed off each other that

7    way.  They encouraged each other to engage in risky and

8    criminal behavior.  And I think it's significant that neither

9    of them did it before or since they were together.

10           As far as deterrence is concerned, the government

11    concedes, I don't remember whether it was Mr. Frank or I who

12    made the observation that after serving a prison sentence, and

13    even if you were lenient, the sentence will be substantial,

14    after serving a prison sentence, because of her age, and

15    because of having been through this process, having been

16    prosecuted, Ms. Mason is not a danger to re-offend, and the

17    need for specific deterrence in that respect is very low.

18           The question then becomes:  What is the-- what

19    sentence is necessary to serve the purpose of general

20    deterrence?

21           THE COURT:  Well, before we leave specific

22    deterrence, could you comment about contacts, and apparently

23    phone communication between your client and individuals in the

24    Southern District of Indiana who Agent Shearer has described in

25    his testimony in light of the bond restriction that was placed

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    on her by Judge Carmody.

2         MR. MINOCK:  Yes.  Very simply, several of the-- Ms.

3    Mason had several friends from southern Indiana.  She and

4    Mr. Ambrose lived there when they were together at first, and

5    she had friends there.  Some of those friends were assisting

6    her in fund raising efforts, things like T-shirt sales to help

7    raise money for her defense.

8         THE COURT:  These individuals are described by Agent

9    Shearer as individuals who were involved in criminal

10   involvement involving environmental causes.

11        MR. MINOCK:  Yes.

12        THE COURT:  Wasn't the restriction by Judge Carmody

13   no contact?  It didn't make any exceptions in the order.  I'm

14   looking at the order right now, Paragraph 24.

15        MR. MINOCK:  Right.

16        THE COURT:  Contact is hardly justifiable even if it

17   is for fund raising purposes, correct?

18        MR. MINOCK:  The point here is that she did not know

19   they were involved in the trespassing offenses that were

20   referred to.  She wasn't aware of that.  And they wouldn't

21   necessarily have told her that.

22        THE COURT:  How does that square with the temporal

23   proximity between the I-69 incidents and the telephone

24   communication?

25        MR. MINOCK:  Because there were so many telephone

1    communications and email communications, and because the I-69

2    protests were ongoing too.  It wasn't like it was one day this

3    month, another day, you know, another Sunday 60 days later,

4    these things went on for a period of months.  I remember having

5    conversations with Mr. Frank and with my client about no

6    contacts of this sort last summer.  And Mr. Frank impressed

7    upon me, and I impressed upon my client, that she should be as

8    suspicionless as Caezar's wife, which sent me to Wickipedia to

9    look up precisely what the reference was, and I related that to

10   my client.  So we had discussions about that.  I do not believe

11   that she had contacts with anybody there knowingly having

12   anything to do with the protests.  I think it was, as she said,

13   she was in communication with them as friends and about their

14   assistance in fund raising.

15          THE COURT:  All right.  Thank you.  Go ahead.  What

16   about the sealed record that Mr.-- again on specific

17   deterrence, what about the sealed record that Mr. Frank has

18   filed and what that says about the notion of specific

19   deterrence?

20          MR. MINOCK:  I'll say two things about that.  One,

21   Ms. Mason was asked and declined to enter into a plea

22   agreement, which would have included cooperation and a 5K

23   motion.  And she did not do that in part out of her strong

24   belief that she is responsible for her activity and she did not

25   want to harm anyone else in order to improve her own

 1   situation.

 2              THE COURT:  Well, and that is her right.

 3              MR. MINOCK:  In addition, I believe, although the

 4   government disagrees with me, that despite the order which is

 5   under seal, that Ms. Mason still had a privilege.  And the

 6   reason I believe that are the dangers of the-- fraught with the

 7   possibility of a perjury prosecution, and I think I referred

 8   the Court when we discussed this in chambers to, In Re:

 9   Morganroth.  So part of her declining there, I think, was based

10   upon an apprehension on her part and my legal opinion that she

11   still may have had a privilege.  Now, the issue was not brought

12   to a head, because of the manner in which Mr. Frank handled the

13   situation, but I don't think that you can read too much into

14   that.

15              Does the Court have any other questions?

16              THE COURT:  No.  You may move on to general

17   deterrence, sir.

18              MR. MINOCK:  I was surprised that the second part of

19   the sentencing memo wound up with so many footnotes.

20              THE COURT:  So many?

21              MR. MINOCK:  Footnotes.

22              And one of the reasons was the issue of general

23   deterrence that Mr. Frank raised sent me to do some research.

24   And I am sure you are probably aware of the research too, there

25   is no clear, provable link between the length of sentence, that

1    is a sentence of 10 years as opposed to 20 years, and general

2    deterrence.  The length for which-- the variable for which

3    there is statistical support is certainty of punishment, not

4    the length of it.  And I think this is something that I can

5    recall having researched it in connection with another case,

6    perhaps even before the advent of the guidelines, that is, the

7    certainty of punishment that acts as a deterrent, and that the

8    length really does not.

9           It also raises a question of what is fair.  I mean,

10   Ms. Mason is a middle-aged, mild-mannered woman, who but for

11   the terrorism enhancement would be in Criminal History Category

12   I, and as you noted, committed other offenses, so maybe she

13   would deserve something more than that.  But she is simply not

14   a sociopathic or antisocial person who would warrant being made

15   an example of to the extent that the government urges.

16          I think that you should-- I think that you should

17   take into consideration the sentences that were imposed in the

18   west coast cases which represents, as I said, the universe of

19   non-murderous terrorism enhancement cases, cases where there

20   was only property destruction intended.  I think you should

21   take those cases into consideration.  I think you should take

22   into consideration the sentence that you imposed upon

23   Mr. Ambrose, and impose a sentence here that fits with the

24   parsimony clause of 3553(a), that is, sufficient, but not

25   greater than necessary.

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1           There is, I submit, not a need to be punitive here

2    nor to impose an unwarranted tariff on the sentence simply by

3    virtue of the fact that the case is in this district.

4           Does the Court have any other questions?

5           THE COURT:  I do not.

6           MR. MINOCK:  Thank you.

7           THE COURT:  Thank you, Mr. Minock.

8           Before I call on Ms. Mason, Mr. Frank, do you wish to

9    address the point that Mr. Minock made regarding the sealed

10   record that you filed?

11          MR. FRANK:  Yes, your Honor.

12          The record brief and I think the conclusion to be

13   drawn from that record is clear, there was no legal

14   justification for-- there is no legal justification, and I

15   think what that record demonstrates is a continuing-- as we

16   mentioned in our sentencing memorandum, loyalty is to be

17   admired depending upon who or what someone's loyalty is bound

18   to neutral itself on.  As far as there being any legal argument

19   that she's still somehow entitled, I think the scope of the

20   order is clear.  Also that argument also presupposes that the

21   government would take on the prosecution of perjury, assumed

22   it, and as the Court knows, proving perjury is a pretty tough

23   burden, those are hard cases to make, that she perhaps wind up

24   there by accident.  No, she couldn't have, not when it's the

25   Justice Department policy on charging and only bringing readily

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    provable cases.  We don't think the record supports that

2    argument.

3              Thank you.

4              THE COURT:  Thank you, sir.

5              Ms. Mason, is there anything you wish to say on your

6    own behalf, ma'am?  You may stand at the podium or remain at

7    your desk, whichever you wish.

8              Sure.

9              THE DEFENDANT:  Your Honor, I do understand the

10   serious nature of the offenses to which I have pled guilty, and

11   I do accept responsibility for my actions.  At the time, I

12   feared there were dire and immediate threats to both human and

13   non-human lives and that the health and safety of human

14   communities as well as the ecological integrity of the earth

15   were in jeopardy.  I care deeply about my fellow human beings

16   and the other living creatures with whom we share this planet.

17   I felt responsible to take extreme action in the hope it would

18   save lives and halt deadly practices that directly threatened

19   living beings and contributed to the degradation of the

20   environment.  I thought that what I was doing would shine a

21   light on these dangerous policies so that an informed public

22   dialogue would ensue and policies would change through

23   democratic process, sir.

24             In all of my actions, I was present at the moment

25   that property damage was done or the fire was set, and I was

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1   hoping in this way that I could ensure that no living creature

2   would inadvertently wander into the site and be in danger.  At

3   the time, I felt it was possible to anticipate and avoid any

4   potential threat to life by taking precautions and by being

5   vigilant at each event.  This was not possible despite my

6   efforts.

7           In particular, the arson at MSU ended up greatly

8   exceeding the scope of my intent, so much so that I almost

9   became the first casualty in these types of offenses.  Even so,

10  other than this one instance of danger to myself, I remained

11  blinded to the risk that others were exposed to during that

12  action.  Much later, even years later, I became aware of how

13  other people who came to the scene after I left were frightened

14  and confused.  And I also found out that students and employees

15  were greatly inconvenienced and lost personal property, that

16  they felt that there might be a continued threat to them, even

17  though that wasn't intended.

18          As I understand it now, fire fighters entered the

19  building and were also in danger from the fire and subsequent

20  water damage to the building.  I never anticipated or intended

21  that anyone would have been endangered, and I am truly sorry

22  that anybody's life was put at risk.

23          For more than 20 years I've participated in every

24  legal avenue open to me as a private citizen to educate and

25  persuade government officials and corporate representatives, my

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    fellow citizens to reconsider policies.  I've also participated

2    in many civil disobedient actions in a style taught by Martin

3    Luther King, Jr., and Mahat Maghandi, whose nonviolent

4    teachings I embraced.  Given my commitment to nonviolence, it

5    was only under an extreme set of circumstances that I

6    rationalized my actions and put people in danger.  I believe

7    that I was taking risks to prevent a greater and more imminent

8    harm to living beings.  I never intended to cause danger or

9    harm to any living thing, and by that standard, I failed.

10           I want to explain that the more I learned of the

11   consequences of deforestation and genetic engineering, the more

12   desperate I felt.  I'm not opposed to conducting research in

13   the interests of expanding knowledge and bringing improvements

14   to health and well-being when it is conducted in a responsible

15   and humane way.  I've also participated in research at Wayne

16   State University in a responsible way to try and find better

17   ways to recycle plastics.  But genetic engineering research is

18   often conducted in open air situations that release

19   contaminated pollen into the environment with devastating

20   effects, as is the case in the terminator seed plants, and

21   communities should have the right to choose or refuse the risks

22   that come with GMOs.  What I was more and more aware of in my

23   research and in my dealings with indigenous activist work

24   around the globe is that the use of GMOs forced on communities

25   by collusion between banks, companies and governments was

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    causing starvation and death and environmental damage through

2    contact with the GMOs.  And I felt so much grief for this

3    needless suffering and these needless deaths, mostly of the

4    infirmed and the very young.

5           The threat posed to all of us by global warming, for

6    which the world's forests act as a buffer against, is direct

7    and dramatic.  The increase in catastrophic storms that caused

8    so much death and destruction in New Orleans and in many parts

9    of Asia are attributable directly to the erratic warming of the

10   planet.  Forests sequester carbon and cool the planet, and as

11   we lose them, we lose the time we need to find new and more

12   sustainable ways of fulfilling our energy needs before global

13   climate crisis is unavoidable.

14          Despite my despair, I have never felt entitled to

15   cause physical harm in order to protect life.  I have always

16   taken to heart the Buddhist spiritual principle to take no

17   action that would bring physical harm to any living being.

18   Although there were some risks associated with my actions that

19   were unintentional and unanticipated, I had convinced myself

20   that they could be eliminated.  In retrospect, I see that this

21   was not possible, and I regret it.  I acknowledge that greater

22   harm could have happened, and that it is very fortunate that no

23   one was physically hurt, and I do understand that there was

24   psychological damage done to the people who were in fear.  I

25   acknowledge these risks, and knowing what I know now, I would

1    not have taken the same action.

2              My actions were individual acts of conscience, and I

3    take sole responsibility for them.  The property damage was

4    intended to be symbolic and theatrical in nature, not dangerous

5    or threatening to any individual.

6              I hope to protect my community and the earth, to

7    respond in defense of the living systems of animals, land and

8    water.  I tried to preserve the natural world from destruction

9    because it is all of our home, because its health is necessary

10   for all of us to live well.

11             I have failed to bring about the changes that I

12   sought and caused harm where I intended none, and I am saddened

13   and sorry for that.  My hope is that the next generation that

14   inherits this earth and the responsibility for stewardship will

15   succeed in finding better methods of bringing about the

16   evolution of our society, a transformation that will benefit

17   all of us who share this beautiful earth.

18             Though I have been wrong and misguided in my actions

19   to defend my community and this earth from harm, I hope to be

20   able to dedicate what is left of my life to service in better

21   ways.  I hope to volunteer at a burn center in my community, as

22   some of my past actions risked injuries of that nature, and I

23   have some first aid training from my work experience as well as

24   training for home healthcare that might be helpful.  I also

25   hope to be able to contribute to community garden programs,

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    both working with at risk youth and providing food for

2    distribution programs.  These gardens have also been pressed

3    into service to provide herbs to free herbal palliative

4    healthcare, and I've had experience as a volunteer before with

5    these kinds of groups, and would be happy to contribute again.

6           I do want to state that I am genuinely sorry to those

7    who felt personally frightened by my actions.  I was unable to

8    see this as a consequence of my actions before, probably as I

9    was so overwhelmed with my own grief and fear that I could not

10   empathize with how others might perceive these same actions.  I

11   meant to inspire thought and compassion, not fear.

12          I also acknowledge that my actions endangered lives,

13   and I am deeply regretful for that.  It was never my intention

14   to cause physical harm, and certainly not serious injury.  I

15   was wrong to believe it could always be avoided.  I am and

16   always will be grateful that my actions did not result in death

17   or injury, but I do understand now that the risk was there.

18          And lastly, and most painfully, I feel that I need to

19   apologize for the expense and suffering that my actions have

20   caused my family and most especially my children.  I love my

21   family very much and this has been so hard on them.  And they

22   have been loving and generous and constant in their support for

23   me.

24          I hope that you'll take all of this into

25   consideration as you make your decision, your Honor.


              KATHLEEN S. THOMAS, U.S. District Court Reporter
         410 West Michigan Avenue, Kalamazoo, Michigan  49007
                         (269)385-3050

1          THE COURT:  Thank you, Ms. Mason.

2          Mr. Frank, anything further?

3          MR. FRANK:  No, your Honor.

4          THE COURT:  Mr. Minock, anything further?

5          MR. MINOCK:  No, thank you.

6          THE COURT:  All right.  Thank you.

7          It's the Court's duty to impose a sentence sufficient

8    but not greater than necessary to comply with the purposes of

9    sentencing set forth in 18 U.S.C. 3553(a).

10          The Court recognizes that the guidelines are advisory

11   to the Court.  The Court takes the guidelines into account as

12   an initial benchmark or starting point when sentencing in this

13   case.  I recognize I must make an individualized assessment

14   based on the facts presented.  The guideline range is one of

15   the array of factors warranting consideration.

16          The 3553 factors are the nature and circumstances of

17   this offense, the history and characteristics of the

18   defendant.  The sentence must reflect the seriousness of the

19   offense, promote respect for law, provide just punishment for

20   the offense, afford adequate deterrence to criminal conduct,

21   protect the public from further crimes of the defendant, to

22   provide the defendant with needed medical, educational and/or

23   correctional treatment, the need to avoid unwarranted

24   sentencing disparity among similarly situated defendants and

25   the kinds of sentences available to the Court.


                KATHLEEN S. THOMAS, U.S. District Court Reporter
           410 West Michigan Avenue, Kalamazoo, Michigan  49007
                          (269)385-3050

1              The Court will state once again that I have reviewed

2       in its entirety the sentencing memorandums that have been

3       submitted, including all of the attachments, including the

4       letters submitted on the defendant's behalf and the victim

5       impact statements that have been submitted to me as well-- as

6       well as the eloquent statement of Dr. Gray that he made in

7       court today.

8              I'm also mindful of the exhibits that have been

9       prepared for me this morning, and also the videotape of the

10      fire that occurred on the Michigan State University campus on

11      December 31, of the year 1999.

12             I have a request from the government in terms of a

13      non-binding recommendation to impose a 20 year sentence on the

14      defendant.  The defendant requests either a departure or a

15      variance from the advisory sentencing guideline range for the

16      reasons stated in their memorandum and in the argument of

17      counsel.

18             First, I want to thank counsel for their

19      professionalism throughout the litigation of this case and the

20      quality of the submissions, both written and oral, that I have

21      received during the course of this Court's administration of

22      this case.

23             I also want everyone do know that I have thought very

24      deeply about this case and have considered every legal and

25      factual argument that has been placed before me.


                  KATHLEEN S. THOMAS, U.S. District Court Reporter
              410 West Michigan Avenue, Kalamazoo, Michigan  49007
                              (269)385-3050

1           As I have said before, but I want to reiterate again,

2    the Court recognizes the discretion granted to it by the line

3    of Supreme Court cases starting with Booker, including

4    Kimbrough, Rita and Gall, as well as the most recent Supreme

5    Court cases of Spears and Nelson.

6           As far as the 3553 factors are concerned, one

7    includes the history and characteristics of the defendant.

8    It's quite apparent to me, based on Ms. Mason's statement here

9    today as well as the record in this case, that Ms. Mason is a

10   very intelligent, well spoken individual, highly educated,

11   indeed she has a degree in chemistry.  She has been described

12   as self-effacing and mild mannered.  She is the mother of two

13   children.  And during the course of her life has done very

14   significant and admirable charitable work with causes in the

15   City of Detroit and elsewhere during the course of her life.  I

16   was particularly struck by the letter from Ms. Orduno, who

17   talked about Ms. Mason's work with the water affordability

18   plan, and she's described by Ms. Orduno as an effective group

19   leader.  That is only one of the lawful charitable work and

20   advocacy of social causes that Ms. Mason has engaged in over

21   the course of her life.  In addition to that, the Court has

22   received many letters attesting to, in their judgment, the

23   positive qualities of Ms. Mason as they know it during the

24   course of their contact with her.

25           She has an, in terms of convictions, a minor

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1   misdemeanor record which, based on the description of the

2   offenses in the presentence report, would indicate to me that

3   these were convictions arising from demonstrations or other

4   things in her time as an advocate of environmental causes or so

5   infer.  She would, absent the terrorism enhancement guideline,

6   she would be placed in Criminal History Category I.  For

7   reasons that I've already stated on the record, however, I

8   think she is aptly placed in Criminal History Category VI,

9   given her admission to the conduct which is contained in the

10  presentence report which contains multiple felony offenses,

11  both at the state and national level.

12          It's also clear to the Court that she has the

13  emotional support of her family.  And as I've said before, she

14  is a well spoken individual.

15          Mr. Minock attests to an evolution of the defendant's

16  thought process, apparently over the immediate past months,

17  because certainly her conduct, including violation of court

18  orders, would belie that assertion.

19          One of the factors too for the Court to consider is

20  adequate deterrence to criminal conduct.  This typically

21  involves deterrence both in a general and specific way.

22  General deterrence is generally thought of as sending a message

23  to those who might contemplate similar criminal behavior, that

24  if they are caught and prosecuted, that the sentence will

25  reflect the criminality that is before the Court.

1          In this regard, I note Dr. Gray's statement that this

2    offense was committed on the open campus of Michigan State

3    University.  I infer that the selection of Michigan State

4    University was no accident.  Michigan State University had been

5    the victim of a 1993 fire, for which Mr. Coronado described on

6    Ms. Mason's website as a hero.  Mr. Coronado has been convicted

7    of that offense and was sentenced by my colleague Judge Enslen

8    back in the mid '90s.

9          Offenses of this kind, and in this particular case,

10   is an offense committed in the dead of night, affording

11   protection of darkness to avoid detection and with a

12   significant degree of planning.  It's obvious from the tape

13   that this fire was extensive.  It is a huge building in the

14   center of the Michigan State University campus.  I recognize

15   this occurred on New Year's Eve, but I question whether there

16   was any potential-- I do think there was potential that there

17   might have been human beings in that building.  It is a

18   research facility.  A research facility in most forums requires

19   24 hour attention.  I recognize this is a holiday, but the fact

20   is that there was a potential for human beings to be in that

21   building.  Fortunately, there wasn't.  But as far as Count Two

22   is concerned, I've also got to take into account that obvious

23   and significant danger to fire fighters that responded to this

24   fire from multiple departments.

25          In the Court's judgment on the subject of general

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    deterrence for those contemplating crimes such as the ones that

2    are before the Court, is so violative of the norms of society

3    that sentencing of those apprehended must send a clear signal

4    that if convicted a firm significant incarcerative sentence,

5    which incapacitates the offender for a prolonged period of

6    time, is necessary.

7        I recognize the criminal justice commentators that

8    Mr. Minock has sent me or referred me to in his sentencing

9    memorandum, I recognize them, but I do not follow the substance

10   of the conclusions of those articles.

11       As far as specific deterrence of this defendant, the

12   defense counsel asserts that she is repentive introspective and

13   indeed that's what her statement here today has said about the

14   wrongfulness of her conduct.  The defense also asserts that she

15   is not the kind of individual to engage in this kind of

16   behavior in the past-- or in the future, and at one point in

17   the sentencing memorandum the words surprise and horror are

18   used that no amount of caution would remove the dangers caused

19   by the fire at Michigan State.  I find that to be curious.  Ms.

20   Mason is an educated individual.  She is an chemist.  She knows

21   about the introduction of open flames and gasoline in a

22   confined area.  I just don't understand the alleged surprise

23   and horror.

24       In marked contrast to the assertions from the

25   defense, there is defendant's conduct since she has been

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    indicted in this case, including as late as last month.  I have

2    testimony from Agent Shearer that she was on the telephone with

3    individuals identified by law enforcement as individuals

4    involved in the environmental movement who engage in criminal

5    activity.  It is just not credible that Ms. Mason did not know

6    that the individuals that she was contacting in the Southern

7    District of Indiana were not individuals who were involved in

8    criminal activity in the environmental cause arena.  This is

9    directly contrary to Paragraph 24 of Judge Carmody's order on

10   bond, which states, "No contact with others with past or

11   present criminal involvement regarding environmental causes."

12   I have heard the assertion about fund raising.  And I will take

13   as true that fund raising was part of the conversation, but the

14   simple fact was that Ms. Mason was not supposed to have any

15   contact with any of those individuals.  In light of that-- in

16   addition to that, we have the sealed memorandum filed by the

17   government, which in the Court's judgment, shows contrary to

18   her assertions here today, that she appreciates the

19   wrongfulness of her conduct or that of others or her obligation

20   as a citizen to follow the orders of this Court.

21           In sum, I find the defendant is a high risk to repeat

22   her criminal conduct, and she, in the Court's judgment, is a

23   high risk to offend the public-- is a high risk to the public.

24   Describing Mr. Coronado as one of her heroes is beyond the

25   pale.


                 KATHLEEN S. THOMAS, U.S. District Court Reporter
             410 West Michigan Avenue, Kalamazoo, Michigan  49007
                            (269)385-3050

1          So the Court finds there is a high risk that the-- of

2     this defendant being in among law abiding citizens.  The Court

3     finds that the 3553 factor related to medical, educational or

4     correctional treatment is not-- does not pertain here.

5          In terms of promoting respect for law and providing

6     just punishment, in the Court's judgment, the sentence here

7     must affirm the foundation of our legal system, that is,

8     protection of law abiding citizens by fashioning a sentence

9     within the statutory framework of 18 U.S.C. 3553.

10         Now, to the nature and circumstances of this

11    offense.  In December of 1999, researchers at Michigan State

12    University, a land grant college, heavily involved as Dr. Gray

13    stated here today, were engaged in developing potato strains

14    which were resistent to the tuber moth without the use of

15    pesticides.  The goal of this research was to decrease hunger

16    in Africa and other areas of the globe.

17         On December 31, 1999, the defendant and her

18    co-defendant, Mr. Ambrose, gained entry to the Agricultural

19    Bio-technical Support Project offices, poured gasoline in

20    copious amounts over files, computer hard drives and other

21    articles that were in the office, and then Mr. Ambrose lit an

22    open flame which spontaneously ignited the fumes that had

23    accumulated inside the closed offices, blowing out the window,

24    which landed near a bike rack on the sidewalk next to the

25    agriculture building.  I would note that the agriculture

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    building appears to the Court, based on the map that I've been

2    given, is a central location on the campus of the university.

3    Anyone who had that window land on them would have, at the very

4    least, suffered great bodily harm, if not further damage to

5    their persons.  It caused substantial money damages to the

6    university of approximately $1.1 million, that is taxpayer

7    money, that needed to be paid in order for the building to come

8    back to habitability.  That is fully depicted in the record.

9    But in addition to that, and perhaps even more importantly is

10   the damage to the psyche of the campus of the university, the

11   researchers that were there that were involved in this project,

12   and the Michigan State community in general.  And for that, I

13   would refer the record to Mr. Kiley's letter that is contained

14   in the presentence investigation report.  As well as Dr. Gray's

15   eloquent statement here this morning.

16          Conviction on Count Two of this Indictment contains

17   an element of risk to responding fire fighters.  It is evident

18   and obvious from the proofs here today that this was a very

19   difficult fire to extinguish, that the fire fighters were at

20   very significant risk to their health and safety.  That's what

21   they do every day, but there was no need for them to be on

22   Michigan State University campus on December 31, 1999, except

23   for the criminal activity of this defendant and Mr. Ambrose.

24          And, of course, the goal here of this type of offense

25   is to instill fear and intimidate others, which is the essence

1    of a terrorist act.  Terrorist acts attack societal norms.

2    They deserve the appropriam of those dedicated in the notion

3    that individuals engaged in lawful scientific research, or any

4    other lawful endeavor, ought to be able to live and work

5    without being the victim of such a crime.

6          The federal law provides 20 and 40 year statutory

7    maximums for these crimes to which the defendant has pled

8    guilty.  Few crimes in the criminal code carry greater maximum

9    penalties than the ones for which the defendant stands

10   convicted.  They reflect the seriousness of the offenses in the

11   eyes of the policy makers of this country, the people's

12   representatives, that is the United States Congress and the

13   President of the United States.  So indeed these offenses are

14   of grave consequence.  In this case, the defendant took

15   license, based on her ideological views, to elevate her

16   grievances over the norms of civilized society.

17          On that last point, I want to reflect on what this

18   case is not about.  This case is not about a prosecution for

19   holding political viewpoints.  Freedom of expression is

20   guaranteed by our Constitution, and our society is dedicated to

21   the proposition that the marketplace of ideas exists to

22   facilitate that free expression.  But this case is about an

23   abandonment of the marketplace of ideas in favor of reckless

24   criminal activity where intimidation and fear replace

25   persuasion and dialogue.


KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1          So on the issue of the terrorism enhancement, and the

2     application of twelve levels to that enhancement, I will grant

3     in part the defendant's request to not apply twelve levels to

4     this offense.  Because as Mr. Minock has pointed out, the

5     enhancement is without gradation as far as the number of levels

6     to be applied.  In the Court's judgment, based on my review, I

7     think eight levels should be applied instead.

8          Accordingly, the Court finds that this case is

9     properly scored, after all the other enhancements and grouping

10    rules, etcetera, are applied, that the appropriate offense

11    level for this offense is 32 and the Criminal History Category

12    is VI.  That results in guideline ranges for Counts One and

13    Four of 210 to 240 months, and on Count Two, 300-- I'm sorry,

14    Count Two, 210 to 262 months.  So I have granted in part the

15    defendant's motion to vary from the sentencing guidelines given

16    my discretion under the Supreme Court law and the findings of

17    fact that I have made here today based on the entirety of the

18    record before me.

19         Accordingly, for all of the reasons that I have

20    stated on the record, it is the judgment of the Court that the

21    defendant, Marie Jeanette Mason, receive the following

22    sentences:

23         On Count One, 240 months.  On Count Two, 262 months.

24    On Count Four, this is the logging equipment violation, the

25    Court finds that the guidelines are too high for that

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    violation, and I sentence the-- I vary downward to 180 months.

2    These sentences will be served concurrently.

3            After service of the prison sentences, the defendant

4    shall be placed on supervised release for the rest of her life.

5            Within 72 hours of release from custody of the Bureau

6    of Prisons, the defendant shall report in person to the

7    probation office in the district to which she is released.

8            While on supervised release, the defendant shall

9    comply with the mandatory and standard conditions of

10   supervision, including DNA collection, drug testing.  She's not

11   to possess any firearms, destructive devices or dangerous

12   weapons.

13           Additionally, the defendant shall comply with the

14   following special conditions of supervision:

15           The defendant shall provide the probation officer

16   with access to any requested financial information.

17           The defendant shall not apply for nor enter into any

18   loan or other credit transaction without the prior approval of

19   her probation officer.

20           The defendant will submit any personal computer owned

21   or controlled by the defendant to a search conducted by a

22   probation officer or designee at a reasonable time and in a

23   reasonable manner, without prior notice or search warrant, to

24   determine if the defendant added, removed, updated,

25   reinstalled, repaired or otherwise modified the hardware or

1    software of the computer or hid encrypted files or data

2    inconsistent with the conditions of supervision.

3            Further, the defendant will provide all

4    computer-related billing records, including telephone, cable,

5    internet, satellite and the like, as requested by her probation

6    officer.  Refusal to submit to such search is a violation of

7    the conditions of supervision.  The defendant will warn anyone

8    with whom he or she shares residence that the premises may be

9    subject to search pursuant to this condition.

10           The defendant shall perform 300 hours of community

11   service as directed by her probation officer.

12           The special assessment is $100 on each count, for a

13   total of $300, which shall be due immediately.

14           The Court finds the defendant does not have the

15   ability to pay a fine.  Accordingly, the fine is waived in this

16   case.

17           I also must order restitution, and in doing so, as I

18   go down the list, please recognize, as eloquently stated by Mr.

19   Moffitt in his victim impact statement, he ran a business.

20   Devastated, the business had little operating capital.  He had

21   sleepless nights as a result of the actions of this defendant.

22   This is just, in the Court's judgment, just an example of the

23   victimization by this defendant and her co-conspirators.

24           Restitution is ordered as follows:

25           Deer Park Construction, Bloomington, Indiana,


KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1   $95,000.

2             Logging equipment in Bloomington, Indiana, $55,000.

3             Sterling Woods Development, $200,000.

4             Crider and Crider, $500,000.

5             Morgan-Monroe State Park, $5,500.

6             Yellowwood State Forest, $1,600.

7             Rose Acre Farm, $100,000.

8             Martin State Park, $55,000.

9             Mystic Forest, Superior Township, in the Eastern

10   District of Michigan, $1,000,000.

11            Willow Ridge, Macomb County, $1,000,000.

12            Michigan State University, $1.1 million.

13            Keith Musselman, $18,000.

14            Dr. James Boydston, $9,436.

15            I do not know whether Mr. Moffitt's request and the

16   request of Zurich Insurance that was filed with the Court

17   yesterday are cumulative or not, but I also order restitution

18   to those individuals in the amounts requested.  Again, if they

19   are duplicative, then obviously then there is no need to order

20   those amounts specifically.

21            The total loss due to this conspiracy is $4,139,536.

22   The Court would also note for the record that some of the

23   businesses that were victimized here have gone out of

24   business.  Any payment made that is not a payment in full shall

25   be divided proportionally among the persons named.


                  KATHLEEN S. THOMAS, U.S. District Court Reporter
                  410 West Michigan Avenue, Kalamazoo, Michigan  49007
                              (269)385-3050

1          The defendant's restitution obligations shall not be

2    affected by restitution payments made by other defendants.

3          Restitution payments shall be made to the United

4    States District Court Clerk for distribution to the victims.

5    The defendant shall apply all monies received from income tax

6    refunds, lottery winnings, judgements, and/or other anticipated

7    or unexpected financial gain to any court-ordered financial

8    obligations.

9          Mr. Minock, any recommendations to the Bureau of

10   Prisons that you would like, sir?

11         MR. MINOCK:  I understand that the correctional

12   institution in Lexington is not only relatively close to

13   Michigan, it's probably among the closest, but also has

14   programs that would be best suited for this defendant.

15         THE COURT:  Well, I will--  So you want an

16   institution as close to Lexington, Kentucky?

17         MR. MINOCK:  Yes, I believe Lexington.

18         THE DEFENDANT:  Yes, it's in Lexington, which is

19   close.

20         MR. MINOCK:  As close to-- certainly as close to her

21   family as possible.

22         THE COURT:  All right.  That I will-- that I do in

23   course.  That request is granted.

24         Any findings on the 3553 factors or other matters

25   that I have not addressed and that you would like addressed,

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1   Mr. Minock, other than obviously what is on the record

2   already?

3            MR. MINOCK:  No.

4            Is the Court asking whether I have objections?

5            THE COURT:  That was my second question.  Go ahead.

6            MR. MINOCK:  Well, I object based upon the fact that

7   the sentence imposed here is a substantial disparity, that the

8   degree of departure and variance is not adequate to take that

9   into account, that points should not have been assessed for

10  leadership on the theories that were assessed by the probation

11  department and in the presentence report on the theory that she

12  led other co-defendants at the Mesick incident, and I object

13  there is no way of showing of that on this record.  And also,

14  as I stated, application of the-- I'm trying to be over

15  cautious here.

16           THE COURT:  That's all right, sir.

17           MR. MINOCK:  I'm not precisely clear how many

18  objections I need to make, based upon the Sixth Circuit's

19  decision in Blackmon.

20           THE COURT:  You be as thorough as you think you need

21  to be, sir.

22           MR. MINOCK:  And I object to imposition of the

23  terrorism enhancement at all.  And for all the reasons I've

24  stated, including that the case is significantly out of the

25  heartland.  And secondly, that it is not-- does not comport

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    with the intention of Congress.

2              THE COURT:  Thank you, sir.

3              MR. MINOCK:  Thank you.

4              THE COURT:  Mr. Frank, any legal objections to the

5    sentence imposed?

6              MR. FRANK:  No, your Honor.

7              THE COURT:  Are there counts to be dismissed?

8              MR. FRANK:  Yes, your Honor.  Government moves to

9    dismiss Count Three.

10             THE COURT:  That motion is granted.

11             Ms. Mason, I advise you, ma'am, that you can appeal

12   your conviction if you believe that your guilty plea was

13   somehow unlawful or involuntary or if there are some other

14   fundamental defect in the proceeding not waived by your guilty

15   plea.

16             You also have a statutory right to appeal your

17   sentence under certain circumstances, particularly if you think

18   the sentence is contrary to law.  You have the right to apply

19   for leave to appeal in forma pauperis if you are poor.  If you

20   wish to do so, with a few exceptions, you need to file the

21   documents for which your attorney is acknowledging receipt on

22   your behalf within ten days of the entry of the judgment in

23   this case.  If you file the documents, the Clerk of the Court

24   will prepare and file notice of appeal upon your request.

25             Counsel, anything further before I remand the

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

```
 1   defendant?

 2              MR. FRANK:  Not from the United States, your Honor.

 3              MR. MINOCK:  No.

 4              THE COURT:  The defendant is remanded to the custody

 5   of the marshal for execution of sentence.

 6              COURT CLERK:  All rise, please.

 7              Court is in recess.

 8              (At 12:37 p.m., proceedings were concluded.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

```
 1

 2

 3

 4                       REPORTER'S CERTIFICATE

 5

 6

 7          I, Kathleen S. Thomas, Official Court Reporter for

 8     the United States District Court for the Western District

 9     of Michigan, appointed pursuant to the provisions of Title

10     28, United States Code, Section 753, do hereby certify

11     that the foregoing is a true and correct transcript of

12     proceedings had in the within-entitled and numbered cause

13     on the date hereinbefore set forth; and I do further

14     certify that the foregoing transcript has been prepared by

15     me or under my direction.

16

17

18                       /s/
                         _____
19                       Kathleen S. Thomas, CSR-1300, RPR
                         U.S. District Court Reporter
20                       410 West Michigan
                         Kalamazoo, Michigan   49007
21

22

23

24

25



            KATHLEEN S. THOMAS, U.S. District Court Reporter
        410 West Michigan Avenue, Kalamazoo, Michigan   49007
                         (269)385-3050
```